UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____x        Civil Action No.

LUXEXPRESS 2016 CORP.,ALAMO GROUP INC.,                    15-cv-4880-VSB
LUXEXPRESS-II LTD., MYKOLA IVANENKO
And LARYSA IVANENKO,

                                  Plaintiffs,

                                                            **SECOND
AMENDED COMPLAINT**

                      -v-

GOVERNMENT OF UKRAINE; VIKTOR
YANUKOVICH; ALEXANDER YANUKOVICH;
MYKOLA AZAROV; ALEXEY AZAROV;
YURY ANISTRATENKO; VALERIY
KHOROSHKOVSKIY; ANDREW KLYUYEV;
SERGEY KLYUYEV; VITALIY ZAKHARCHENKO;
VIKTOR PSHONKA; ARTEM PSHONKA;
RENAT KUZMIN; ANATOLIY MELNIK;
VLADIMIR GOGOL; OLENA LUKASH;
VICTOR TATKOV; ARTUR YEMELYANOV;
BORIS KOLESNIKOV; VLADIMIR KOZAK;
ALEXEY KRYVOPISHIN; ALEXSANDER RYBAK;
ALEXANDER POPOV; ANATOLIY GOLUBCHENKO;
GALINA GEREGA; LEONID CHERNOVETSKIY;
SERGEY KURCHENKO; ARSENY YATSENYK;
VIKTOR SHOKIN; BORIS OSTAPYUK; and
JOHN DOES 1 through 20,

                                    Defendants.

_____ x

      Plaintiffs LUXEXPRESS 2016 CORP., ALAMO GROUP INC., LUXEXPRESS-II

LTD., MYKOLA IVANENKO and LARYSA IVANENKO, by and through their undersigned

counsel, for their Second Amended Complaint against the above-captioned defendants, allege as

follows:

## **INTRODUCTION**

      1.      This case relates to the wrongful taking, expropriation and destruction of

Plaintiffs' business property without compensation as part of a conspiracy and corrupt

scheme by Ukrainian government officials from, among others, the Office of the President,

Office of the Prime Minister, Office of Chief Prosecutor, Ministry of Justice, Economic

Court, Ministry of Transportation, Ministry of Internal Affairs, and the local government of

Kyiv to benefit those government officials and their family members at the expense of

Plaintiffs.

2.      Plaintiff Luxexpress 2016 Corp., which is incorporated and domiciled in

the State of New York,[1] is the owner and successor to rights to Plaintiff Luxexpress-II

Ltd. (also sometimes referred to as Luxexpress-II Corp.), which was the corporate

plaintiff named in the Amended Complaint previously filed in this action. An additional

shareholder in Luxexpress 2016 Corp. is another U.S. corporation, Plaintiff Alamo

Group Inc., which is incorporated and headquartered in Georgia, and which is owned

by Mark Reznik, a United States citizen.[2]

3.      The individual plaintiffs in this action are Mykola Ivanenko and Larysa

Ivanenko, who are former Ukraine nationals who are now living in the United States

and have an application pending with the Department of Homeland Security as

political refugees.

4.      Between 1993 to 2012, Plaintiffs operated a successful automobile

import business in Kiev, Ukraine, which primarily imported American cars through

various U.S. suppliers, including Plaintiff Alamo Group Inc. Plaintiffs operated their

---

[1]

https://appext20.dos.ny.gov/corp_public/CORPSEARCH.ENTITY_INFORMATION?p_token=64A03FE
A6C5CEED10918B58A7ABB58AACB89066E1A0D374EA558E34FB64F079D73966726D33517D65C
CAFE6A13BA131A&p_nameid=F7C6D1615284F100&p_corpid=597F70B9B92F525C&p_captcha=17
587&p_captcha_check=4FBE148A8B1F0E8B&p_entity_name=%4C%75%78%65%78%70%72%65%7
3%73&p_name_type=%41&p_search_type=%42%45%47%49%4E%53&p_srch_results_page=0
[2]

https://ecorp.sos.ga.gov/BusinessSearch/BusinessInformation?businessId=152913&businessType=Domes
tic%20Profit%20Corporation

business on prime business property in Kiev, Ukraine. Plaintiffs also planned to open

a large hotel and conference center on its property in Kiev, in partnership with the

Marriott Corp.

5.      Plaintiffs' close affiliation with U.S. companies and business interests

was perceived as a threat to the pro-Russian regime of then President Viktor

Yanukovich, who was attempting to steer the Ukraine to a closer political and

economic alliance with Russia and its Eurasian partners. In July 2004, the business

operations of Plaintiffs were targeted and summarily shut down by the Ukraine

authorities, as part of a concerted by the then corrupt and pro-Russian regime in

Ukraine to eliminate pro-Western businesses in Ukraine who were pursuing and

promoting business opportunities and investments between the United States and the

Ukraine.

6.      The Defendants took Plaintiffs' business and property as part of a

concerted plan and scheme to expropriate pro-Western businesses in Ukraine without

compensation. As Ukraine's former Deputy Chief State Prosecutor stated in

connection with a report entitled, the "Interdepartmental Raiding Commission of the

Ukraine":

> [T]o expropriate business (in the Ukraine). . . is sadly cheaper than to
> acquire it and that's the economic basis of raiding . . . and one of the key
> problems (in the Ukraine) is corruption in courts, law enforcement and
> the organs of the state executive. [3]

---

[3] *Property, Predation, and Protection, Piranha Capitalism in Russia and Ukraine*, Stanislav Markus, Cambridge University Press, 2015, page 62.   *See*
*https://books.google.com/books?id=ZpqiBQAAQBAJ&pg=PA62&lpg=PA62&dq=Zanfirov+and+corrup*
*tion&source=bl&ots=TYeAG-*
*hVb9&sig=rg96s6qv3GlqexH14FpeJpM3s9c&hl=en&sa=X&ved=0ahUKEwj9gIacyZnQAhUnrlQKHVY*
*zCQYQ6AEIHTAA#v=onepage&q=Zanfirov%20and%20corruption&f=false*

7.     It has widely been reported that corruption and the unlawful taking of business property has plagued the Ukraine since its independence from the former Soviet Union and the so-called Orange Revolution of 2004 – 2005. Specifically, Ukraine has a political system wherein Ukraine governmental systems are rigged in favor of the political friends and allies of the ruling elite, who have systematically seized and allocated land, land rights, business enterprises and other property without justification and compensation. In addition, Ukraine's judicial system has been plagued by corruption and cronyism, where political pressure is often brought to bear on judges, and significant obstacles and barriers have been placed on U.S. and Western European companies seeking to do business in Ukraine, and Ukrainian companies promoting those pro-western business interests and contracts.

8. After unlawfully seizing Plaintiffs' business and property, and thereafter refusing to restore said business property and/or to provide just compensation for such seizure, the defendants engaged in a concerted effort to intimidate Plaintiffs and to silence them, including the making of death threats against Plaintiff Mykola Ivanenko.

9.     The rampant corruption and unlawful taking of business property reached such epidemic proportions that the U.S. and its European allies have been forced to take drastic action. For example, three European countries recently moved to freeze/seize billions of dollars alleged to have been stolen via corrupt and fraudulent acts committed by former President Yanukovych and his cronies, many of which are named defendants in this case.

10.     Similarly, the United States Department of Treasury has put U.S. banks on notice to watch for accounts and transactions where Defendant Yanukovych may

have or may attempt to launder money amassed through misappropriations, corruption, theft of assets and other unlawful conduct by which Ukrainian and foreign businesses, including Plaintiffs and their U.S. business partners, were victimized. The FBI and Department of Justice have already opened an investigation into Defendant Yanukovych's use of US companies and banks as part of the corruption, theft, money laundering and other racketeering activities that plagued the Ukraine and through which Plaintiffs and their predecessor corporation were victimized.

11.    The defendant Ukraine government officials used the prime real estate wrongfully taken from Plaintiffs to, among other things, open a sports facility owned by relatives of defendant Vladimir Kozak, the former Director General of the State Territorial-Sectoral Association / State Administration of Railway Transport of Ukraine a/k/a "South-Western Railway" and Minister of Infrastructure. This was part of a wider fraudulent corruption scheme that netted defendants, upon information and belief, billions of dollars wrongfully taken from legitimate businesses, such as that conducted by Plaintiffs.

12.    The unlawfully seizure of Plaintiffs' business and property not only damaged their rights and interests in the Ukraine, but it also damaged and had a direct adverse impact on rights and interests of Plaintiffs and their business relations in the United States, since it interfered with their business relationships with United States corporations, such as Alamo Group Inc., with whom they did business. Defendants' wrongful, illegal and unlawful acts that constituted "racketeering activities" include but are not limited to fraud (18 USC § 1341); wire fraud (18 USC § 1343); obstruction of justice (18 USC § 1503); interference with commerce through threats of violence and

extortion (18 USC § 1951 and 1952); monetary transactions in property derived from specified unlawful activity (18 USC § 1957); and racketeering (18 USC § 1961 et seq.).

13.     Defendants' wrongful, illegal and unlawful acts also included abuse of process, tortious interference with contract rights and interference with prospective commercial advantage, and discrimination.

14.     Defendants' wrongful, illegal and unlawful acts further violated customary international law, as reflected by the European Convention on the Protection of Human Rights (including Article 13 the "right to an effective remedy"); the Bi-Lateral Investment Treaty between the United States and the Ukraine and other US and international laws prohibiting discrimination based on ideology, politics or beliefs, such as the discrimination to which Plaintiff and its shareholders were subjected.

15.     As a result of Defendants' above delineated wrongful, illegal and unlawful acts (and racketeering activities), Plaintiffs and their business partners in the United States suffered millions of dollars in damages from property seizures, destruction of property, cancellation of property rights, voiding of lease and contract rights and interference with and/or discrimination against business investments and interests by Plaintiffs and other American companies with whom Plaintiff's shareholder had contracts and commercial investment opportunities in the Ukraine, including Harley Davidson, Marriott Corporation and others.  Defendants wrongful, illegal and unlawful acts (and racketeering activities) resulted in domestic injuries to United States corporations and business interests.

16.     Plaintiffs' claims against all Defendants are permissible as Defendants are

not entitled to sovereign immunity because their predicate acts were commercial based and as such fall within the commercial exception to sovereign immunity and the property was taken in violation of international law.  See 28 U.S.C. §§ 1605 (a) (2) (3).  Plaintiffs' claims have also been recognized as permissible in the Supreme Court's recent decision in *RJR Nabisco Inc. et al v. European Community et al*,  579 U.S. ____ (2016) (claims for violation of 18 U.S.C. § 1962 of the Racketeer Influenced and Corrupt Organizations Act (RICO) may be based on a pattern of racketeering that includes predicate offenses committed abroad, provided that each of the alleged offenses violates a predicate statute even if they are extraterritorial but so long as the private RICO plaintiff alleges and proves domestic injury). [4]   Plaintiffs' claims against the individually named Defendants are also permitted by the Supreme Court's decision in *Samantar v. Yousuf*, 560 U.S. 305 (2010) (individual government officials are not within the definition of a "sovereign" and as such do not enjoy immunity and privileges of the FSIA).

17.     Prior to the filing of this Second Amended Complaint, the corporate Plaintiffs and the individual Plaintiffs exhausted all remedies in the Ukraine and made this complaint because of the discrimination against its shareholders and the physical danger and threat of violence, imprisonment and death that the individual Plaintiffs faced if they tried to pursue any claim further in the Ukraine.


**PARTIES**

18.     Plaintiff **LUXEXPRESS 2016 Corp**., which is incorporated and domiciled in

---

[4] *RJR Nabisco Inc. et al v. European Community et al,*  579 U.S. ____ (2016).
See https://www.supremecourt.gov/opinions/15pdf/15-138_5866.pdf

the State of New York,[5] is the owner and successor to rights to Plaintiff LUXEXPRESS-II

LTD. (also sometimes referred to as Luxexpress-II Corp.), a Ukraine corporation that was the

sole corporate plaintiff named in the Amended Complaint previously filed in this action.

      19.    The shareholders of Plaintiff Luxexpress 2016 Corp. are (a) Plaintiff

**ALAMO GROUP INC**. ("Alamo Group"), which is incorporated and headquartered in

Georgia, and which is owned by Mark Reznik, a United States citizen, and (b) Plaintiff

Luxexpress II-Ltd. ("Luxexpress-II"), which is a Ukraine corporation owned by the

individual Plaintiffs, Mykola Ivanenko and Larysa Ivanenko. Starting in approximately

January of 2002, Alamo Group Inc. loaned approximately $300,000 U.S. to Luxexpress-II so

that these two plaintiffs could expand their business operations in Ukraine. See **Exhibit 1**

attached hereto. Also in January of 2002, Plaintiff Alamo Group entered into a "Commercial

Agreement No. 1 – Delivery of Goods", were it committed to $5 million of sales and delivery

of goods to Plaintiff Luxexpress-II in Ukraine. Exhibit 1.  On or about August 1, 2004,

Alamo Group and Luxexpress-II entered into a lease agreement whereby Luxexpress-II

leased a portion of Alamo Group's office space in Atlanta, Georgia, and Alamo Group leased

some of Luxexpress-II's office space in Kiev, Ukraine. See **Exhibit 2** attached hereto.  Also

on August 1, 2004, Plaintiff Alamo Group entered into a "Supplementary Agreement to the

Commercial Agreement No. 1 – Delivery of Goods," whereby it reaffirmed its commitment

to Plaintiff Luxexpress-II in Ukraine. See Exhibit 2. As part of their ongoing business

---

[5]

https://appext20.dos.ny.gov/corp_public/CORPSEARCH.ENTITY_INFORMATION?p_token=64A03FE
A6C5CEED10918B58A7ABB58AACB89066E1A0D374EA558E34FB64F079D73966726D33517D65C
CAFE6A13BA131A&p_nameid=F7C6D1615284F100&p_corpid=597F70B9B92F525C&p_captcha=17
587&p_captcha_check=4FBE148A8B1F0E8B&p_entity_name=%4C%75%78%65%78%70%72%65%7
3%73&p_name_type=%41&p_search_type=%42%45%47%49%4E%53&p_srch_results_page=0

relationship, Luxexpress-II made numerous wire transfers to Alamo Group's bank account in Atlanta, Georgia (See, e.g., **Exhibit 3** attached hereto), and they entered into a Sales/Marketing Agreement, effective August 1, 2004, whereby they conducted an extensive import/export business, which included the sale of automobiles and equipment to U.S. Embassies and NATO employees throughout Europe. See **Exhibit 4** attached hereto. Alamo Group's financial records reflect over $2.5 million in transactions between the two companies between August 2004 and February 2009. See **Exhibit 5** attached hereto. These transactions included the shipment of automobiles from the U.S. to Ukraine, and many of their financial transactions involved international wire transfers. See, e.g., **Exhibits 6 and 7** attached hereto.

20.     Plaintiff **MYKOLA IVANENKO**, a Ukraine national, is an owner of Luxexpress-II Ltd. and husband of plaintiff Larysa Ivanenko.  He currently resides in New York, is a political refugee from Ukraine, and has an application pending with the Department of Homeland Security for political asylum in the U.S.

21.     Plaintiff **LARYSA IVANENKO**, a Ukraine national, is an owner of Luxexpress-II Ltd.  and is the wife Plaintiff Mykola Ivanenko. They currently reside in New York with their two children as political refugees, and have an application pending with the Department of Homeland Security for political asylum in the U.S. They bring this case in accordance with Art. 16 of the UN International Convention Relating to the Status of Refugees, dated July 28, 1951, which requires the parties to the Convention, including the United States, give refugees "free access to the courts of law on the territory of all Contracting States."

22.     Prior to its destruction by defendants in 2012, Plaintiff LUXEXPRESS-II Ltd was a company based in Kiev, Ukraine that primarily imported U.S. manufactured automobiles

into Ukraine for sale there. In addition, plaintiff Luxexpress became the official dealer for retail sale and service maintenance for "Honda", "Nissan" and "KIA" cars.

23.     Plaintiff's predecessor was located on one of the most prestigious and valuable plots of land in Kyiv, at 1 Prytchalna St., which is on the bank of the Dnieper River in Kiev. Under the leadership of Plaintiffs Mykola and Larysa Ivanenko, Luxexpress-II Ltd. was an importer of U.S. automobiles, but also engaged in various land development projects, including a proposed Marriott hotel complex, which would have included a business and trade center, plus a large parking garage. The proposed total area of the hotel, business center and trade center complex was 174,590 square meters.

24.     Plaintiff ALAMO GROUP INC. invested substantial monies in Ukraine in and through its contracts and business with Plaintiff Luxexpress-II Ltd and the Individual Plaintiffs.

25.     Defendant **GOVERNMENT OF UKRAINE** is the political entity that is responsible for the operation of the foreign state of Ukraine, and which is ultimately responsible for the fraud, conspiracy and wrongful and illegal acts against Plaintiffs. The Government of Ukraine operated though its various departments, agencies and instrumentalities, including:

   a.  **THE OFFICE OF THE PRESIDENT OF UKRAINE,** a department, agency and/or instrumentality of the foreign state of UKRAINE, shares responsibility for the running and operation of Ukraine, including its commercial activities

   b.  **THE OFFICE OF THE PRIME MINISTER OF UKRAINE** is a department, agency and/or instrumentality of UKRAINE that shares responsibility for the running and operation of Ukraine, including its commercial activities.

   c.  **THE CABINET OF MINISTERS OF UKRAINE** is a department, agency and/or instrumentality of UKRAINE that shares responsibility for the running and

operation of Ukraine, including its commercial activities.

d. **THE MINISTRY OF TRANSPORT OF UKRAINE** is a department, agency and/or instrumentality of UKRAINE that shares responsibility for the running and operation of Ukraine, including its commercial activities.

e. **THE MINISTRY OF TRANSPORT AND COMMUNICATION OF UKRAINE** is a department, agency and/or instrumentality of UKRAINE that shares responsibility for the running and operation of Ukraine, including its commercial activities.

f. **THE MINISTRY OF INTERNAL AFFAIRS OF UKRAINE** is a department, agency and/or instrumentality of the foreign state of UKRAINE that shares responsibility for the running and operation of Ukraine, including its commercial activities.

g. **THE MINISTRY OF INFRASTRUCTURE OF UKRAINE** is a department, agency and/or instrumentality of UKRAINE that shares responsibility for the running and operation of Ukraine, including its commercial activities.

h. **THE STATE TERRITORIAL-SECTORAL ASSOCIATION / STATE ADMINISTRATION OF RAILWAY TRANSPORT OF UKRAINE a/k/a "SOUTH-WESTERN RAILWAY,** is a department, agency and instrumentality of UKRAINE that shares responsibility for the running and operation of Ukraine, including its commercial activities.

i. **THE MINISTRY OF JUSTICE OF UKRAINE** is a department, agency and/or instrumentality of UKRAINE that shares responsibility for the running and operation of Ukraine, including its commercial activities.

j.  **THE ECONOMIC COURT OF UKRAINE** is a department, agency and/or instrumentality of UKRAINE, and has certain responsibilities within the judicial and court system of Ukraine.

k.  **THE STATE COMMITTEE OF LAND RESOURCES OF UKRAINE** is a department, agency and/or instrumentality of UKRAINE that shares responsibility for the running and operation of Ukraine, including its commercial activities.

l.  **THE GENERAL PROSECUTOR OF UKRAINE** is a department, agency and/or instrumentality of UKRAINE that shares responsibility for the running and operation of Ukraine.

m.  **THE KYIV CITY / STATE ADMINISTRATION** is a municipal entity in UKRAINE that has substantial responsibility for commercial activities within Kyiv, Ukraine.

n.  **THE HEAD ADMINISTRATION OF CITY PLANNING, ARCHITECTURE AND DESIGN OF URBAN ENVIRONMENT** is a municipal entity in UKRAINE that has substantial responsibility for commercial activities within Kyiv, Ukraine.

26.    Defendant **VIKTOR YANUKOVICH** is the former President of Ukraine.

27.    Defendant **ALEXANDER YANUKOVICH**, the son of VIKTOR YANUKOVYCH, former President of UKRAINE, is listed as one of the most corrupt officials in Ukraine, and who conspired with and profited from the corrupt Regime in UKRAINE under his father, VIKTOR YANUKOVYCH. He also has been designated by the US Treasury Department as being involved with misappropriation of public assets and undermining of democratic

processes and institutions in Ukraine.

28.      Defendants VIKTOR YANUKOVICH and ALEXANDER YANUKOVYCH directed the unlawful and corrupt scheme involving the other defendants, which involved money laundering, corruption, bribery, embezzlement and conversion of property. They used their official positions to direct the unlawful scheme and conspiracy of the defendants, and they benefitted from the fraud, conspiracy and wrongful and illegal acts against Plaintiffs.

29.      Defendant **MYKOLA AZAROV,** the former Prime Minister of Ukraine, is listed as one of the most corrupt officials in Ukraine associated with the corrupt regime of VIKTOR YANUKOVYCH.

30.      Defendant **ALEXEY AZAROV**, the son of the former Prime Minister of Ukraine, was a member of the Ukraine Parliament.

31.      Defendants MYKOLA AZAROV and ALEXEY AZAROV, along with the other defendants, engaged in and conspired to engage in a wide range of corrupt activities, including money laundering, bribery, embezzlement and conversion of property. They also used their official positions to direct other defendants and to take directions from other defendants as part of a scheme and conspiracy to benefit from the fraud, conspiracy and wrongful and illegal acts against Plaintiffs.

32.      Defendant **YURY ANISTRATENKO** is the former First Deputy Head of the Cabinet of Ministers of Ukraine and was the Chief of Staff under Defendant MYKOLA AZAROV. Along with the other defendants, he used his official position and influence to engage in and conspire to engage in a wide range of corrupt activities, including money laundering, bribery, embezzlement and conversion of property. He directed other defendants and took directions from them as part of a scheme and conspiracy to benefit from the fraud, conspiracy and

13

wrongful and illegal acts against Plaintiffs.

33.       Defendant **VALERIY KHOROSHKOVSKIY** is the former First Vice Prime

Minister of Ukraine, and is also the former Minister of Economy of UKRAINE. Along with the

other defendants, he engaged in and conspired to engage in a wide range of corrupt activities,

including money laundering, bribery, embezzlement and conversion of property. He used his

official positions to direct other defendants and to take directions from them as part of a scheme

and conspiracy to benefit from the fraud, conspiracy and wrongful and illegal acts against

Plaintiffs.

34.       Defendant **ANDREY KLYUYEV**, the former Secretary of the National Security

and Defense Council of Ukraine, who is listed as one of the most corrupt officials in Ukraine,

conspired with and profited from the corrupt regime of VIKTOR YANUKOVYCH. He has been

designated by the US Treasury Department as being involved with misappropriation of public

assets and undermining of democratic processes or institutions in Ukraine.

35.       Defendant **SERGEY KLYUYEV**, the brother of Andrey Klyuyev, is a member

of the Ukraine Parliament and is listed as one of the most corrupt officials in Ukraine, having

conspired with and profited as part of the corrupt regime of VIKTOR YANUKOVYCH.

36.       Defendants ANDREY KLYUYEV and SERGEY KLYUYEV, along with the

other defendants, engaged in and conspired to engage in a wide range of corrupt activities,

including money laundering, bribery, embezzlement and conversion of property. They also used

their official positions to direct other defendants and to take directions from them as part of a

scheme and conspiracy to benefit from the fraud, conspiracy and wrongful and illegal acts against

Plaintiffs.

37.       Defendant **VITALIY ZAKHARCHENKO**, the former Minister of Internal

Affairs of Ukraine, is listed as one of the most corrupt officials in the Yanukovich regime. Along with the other defendants, he engaged in and conspired to engage in a wide range of corrupt activities, including money laundering, bribery, embezzlement and conversion of property. He used his official positions to direct other defendants and to take directions from them as part of a scheme and conspiracy to benefit from the fraud, conspiracy and wrongful and illegal acts against Plaintiffs.

38.       Defendant **VIKTOR PSHONKA**, the former Prosecutor General of Ukraine, is listed as one of the most corrupt officials in Ukraine associated with the Yanukovich regime.

39.       Defendant **ARTEM PSHONKA**, the son of the former Prosecutor General of Ukraine, is a former member of the Ukraine Parliament and is listed as one of the most corrupt officials associated with the Yanukovich regime.

40.       Defendants VIKTOR PSHONKA and ARTEM PSHONKA, along with the other defendants, engaged in and conspired to engage in a wide range of corrupt activities, including money laundering, bribery, embezzlement and conversion of property. They also used their official positions to direct other defendants and to take directions from other defendants as part of a scheme and conspiracy to benefit from the fraud, conspiracy and wrongful and illegal acts against Plaintiffs.

41.       Defendant **RENAT KUZMIN**, the former Deputy Prosecutor General of Ukraine, also effectively controlled the court system in Ukraine. Along with the other defendants, he engaged in and conspired to engage in a wide range of corrupt activities, including money laundering, bribery, embezzlement and conversion of property. He used his official position to direct other defendants and to take directions from other defendants as part of a scheme and conspiracy to benefit from the fraud, conspiracy and wrongful and illegal acts against Plaintiffs.

15

42.     Defendant **VICTOR ZANFIROV** is the former Deputy Prosecutor General of Ukraine. Along with the other defendants, he engaged in and conspired to engage in a wide range of corrupt activities, including money laundering, bribery, embezzlement and conversion of property. He used his official position to direct other defendants and to take directions from other defendants as part of a scheme and conspiracy to benefit from the fraud, conspiracy and wrongful and illegal acts against Plaintiffs.

43.     Defendant **ANATOLIY MELNIK** is the former Prosecutor of Kyiv. Along with the other defendants, he engaged in and conspired to engage in a wide range of corrupt activities, including money laundering, bribery, embezzlement and conversion of property. He used his official position to direct other defendants and to take directions from other defendants as part of a scheme and conspiracy to benefit from the fraud, conspiracy and wrongful and illegal acts against Plaintiffs.

44.     Defendant **VLADIMIR GOGOL** is the former Deputy Prosecutor of Kyiv. Along with the other defendants, he engaged in and conspired to engage in a wide range of corrupt activities, including money laundering, bribery, embezzlement and conversion of property. He used his official position to direct other defendants and to take directions from them as part of a scheme and conspiracy to benefit from the fraud, conspiracy and wrongful and illegal acts against Plaintiffs

45.     Defendant **OLENA LUKASH**, the former Minister of Justice of Ukraine, is listed as one of the most corrupt officials associated with the Yanukovich regime. Along with the other defendants, she engaged in and conspired to engage in a wide range of corrupt activities, including money laundering, bribery, embezzlement and conversion of property. She used her official position to direct other defendants and to take directions from other defendants as part of

16

a scheme and conspiracy to benefit from the fraud, conspiracy and wrongful and illegal acts against Plaintiffs.

46.     Defendant **VICTOR TATKOV** is the former Chairman of the Supreme Economic Court of Ukraine. Along with the other defendants, he engaged in and conspired to engage in a wide range of corrupt activities, including money laundering, bribery, embezzlement and conversion of property. He used his official position to direct other defendants and to take directions from them as part of a scheme and conspiracy to benefit from the fraud, conspiracy and wrongful and illegal acts against Plaintiffs.

47.     Defendant **ARTUR YEMELYANOV** is the former Chairman of the Economic Court of Kyiv. Along with the other defendants, he engaged in and conspired to engage in a wide range of corrupt activities, including money laundering, bribery, embezzlement and conversion of property. He used his official position to direct other defendants and to take directions from them as part of a scheme and conspiracy to benefit from the fraud, conspiracy and wrongful and illegal acts against Plaintiffs.

48.     Defendant **BORIS KOLESNIKOV**, the former Minister of Infrastructure of Ukraine, is a member of the Ukraine Parliament. Along with the other defendants, he engaged in and conspired to engage in a wide range of corrupt activities, including money laundering, bribery, embezzlement and conversion of property. He used his official position to direct other defendants and to take directions from other defendants as part of a scheme and conspiracy to benefit from the fraud, conspiracy and wrongful and illegal acts against Plaintiffs.

49.     Defendant **VLADIMIR KOZAK** is the former Director General of Railways and Minister of Infrastructure. Along with the other defendants, he engaged in and conspired to engage in a wide range of corrupt activities, including money laundering, bribery, embezzlement

and conversion of property. He used his official position to direct other defendants and to take directions from other defendants as part of a scheme and conspiracy to benefit from the fraud, conspiracy and wrongful and illegal acts against Plaintiffs. Among other corrupt acts, he schemed and conspired to have the property wrongfully taken from Plaintiffs to be used by his daughter and her company for the building of a sports complex.

50.     Defendant **ALEXEY KRYVOPISHIN** is the former principal executive of the South Western Railway. Along with the other defendants, he engaged in and conspired to engage in a wide range of corrupt activities, including money laundering, bribery, embezzlement and conversion of property. He used his official position to direct other defendants and to take directions from other defendants as part of a scheme and conspiracy to benefit from the fraud, conspiracy and wrongful and illegal acts against Plaintiffs.

51.     Defendant **ALEXSANDER RYBAK** is the former Chairman of the State Board of Architectural Construction and Inspection of Ukraine. Along with the other defendants, he engaged in and conspired to engage in a wide range of corrupt activities, including money laundering, bribery, embezzlement and conversion of property. He used his official position to direct other defendants and to take directions from them as part of a scheme and conspiracy to benefit from the fraud, conspiracy and wrongful and illegal acts against Plaintiffs.

52.     Defendant **ALEXANDER POPOV** is the former Chief of the Kyiv City State Administration. Along with the other defendants, he engaged in and conspired to engage in a wide range of corrupt activities, including money laundering, bribery, embezzlement and conversion of property. He used his official position to direct other defendants and to take directions from them as part of a scheme and conspiracy to benefit from the fraud, conspiracy and wrongful and illegal acts against Plaintiffs.

53.      Defendant **ANATOLIY GOLUBCHENKO** is the former Deputy Chief of the Kyiv City State Administration.  Along with the other defendants, he engaged in and conspired to engage in a wide range of corrupt activities, including money laundering, bribery, embezzlement and conversion of property. He used his official position to direct other defendants and to take directions from them as part of a scheme and conspiracy to benefit from the fraud, conspiracy and wrongful and illegal acts against Plaintiffs.

54.      Defendant **GALINA GEREGA** is the former Deputy Mayor of Kyiv, and a former Cabinet Secretary. Along with the other defendants, she engaged in and conspired to engage in a wide range of corrupt activities, including money laundering, bribery, embezzlement and conversion of property. She used her official position to direct other defendants and to take directions from them as part of a scheme and conspiracy to benefit from the fraud, conspiracy and wrongful and illegal acts against Plaintiffs.

55.      Defendant **LEONID CHERNOVETSKIY** is the former Chief of the Kyiv City State Administration. Along with the other defendants, he engaged in and conspired to engage in a wide range of corrupt activities, including money laundering, bribery, embezzlement and conversion of property. He used his official position to direct other defendants and to take directions from them as part of a scheme and conspiracy to benefit from the fraud, conspiracy and wrongful and illegal acts against Plaintiffs.

56.      Defendant **SERGEY KURCHENKO**, a Ukrainian businessman and owner of the company known as VETEK (East European Energy Company), is listed as one of the most corrupt figures in Ukraine who was associated with the Yanukovich regime. He was designated by the US Treasury Department as being involved with misappropriation of public assets and undermining of democratic processes or institutions in Ukraine. Along with the other defendants,

he engaged in and conspired to engage in a wide range of corrupt activities, including money laundering, bribery, embezzlement and conversion of property. He used his influence to conspire with and take directions from other defendants as part of a scheme and conspiracy to benefit from the fraud, conspiracy and wrongful and illegal acts against Plaintiffs.

57.       Defendant **ARSENY YATSENYK** is the current Prime Minister of Ukraine and, as such, is a representative of the current executive branch and administration of Ukraine, which is the successor-in interest to the former Yanukovich administration that was responsible for the unlawful taking and expropriation of plaintiffs' business and property without just compensation.

58.       Defendant **VIKTOR SHOKIN** was, until approximately March 2016, the General Prosecutor of Ukraine, and, as such, is a representative of the current executive branch and administration of Ukraine, which is the successor-in-interest to the former Yanukovich administration that was responsible for the expropriation of plaintiffs' business and property without just compensation. He was dismissed because he was "a symbol of Ukraine's deeply ingrained culture of corruption, failing to prosecute a single member of the deposed Yanukovych regime or of the current government while blocking the efforts of reform-minded deputies." Along with the other defendants, he engaged in and conspired to engage in a wide range of corrupt activities, including money laundering, bribery, embezzlement and conversion of property. He used his influence to conspire with, give directions to and take directions from other defendants as part of a scheme and conspiracy to benefit from the fraud, conspiracy and wrongful and illegal acts against Plaintiffs.

59.       Defendant **BORIS OSTAPYUK** is the former General Director of the State Administration of the Railway Transport of Ukraine (Ukrzaliznytsia) and, as such, was the governmental officer directly responsible for providing just compensation to the plaintiffs for the

expropriation of their business and property. Along with the other defendants, he engaged in and conspired to engage in a wide range of corrupt activities, including money laundering, bribery, embezzlement and conversion of property. He used his influence to conspire with, give directions to and take directions from other defendants as part of a scheme and conspiracy to benefit from the fraud, conspiracy and wrongful and illegal acts against Plaintiffs.

## JURISDICTION AND VENUE

60.     This Court has personal jurisdiction over all defendants by virtue of the fact that their acts of racketeering and/or other tortious activities have had a direct impact on business and other activities in New York and elsewhere in the U.S., or by operation of Fed. R. Civ. P. 4(k) (1-2).

61.     This Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), and 18 U.S.C. § 1964(c) (RICO). Plaintiffs allege that Defendants conducted multiple racketeering activities that had a continuity of structure and purpose over an extended time period. RICO provides federal jurisdiction for persons "injured in [their] business or property" by acts taken pursuant to a racketeering "enterprise."  18 U.S.C. § 1964(c).

62.     This Court also has subject matter jurisdiction under The Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1330, 1441(d), 1602 *et seq*., which provides that a foreign state and its instrumentalities are not immune from suit in United States courts "in which rights in property taken in violation of international law are in issue" and a specified commercial-activity nexus to the United States is present. 28 U.S.C. § 1605(a)(3).

63.     This Court also has jurisdiction over this matter since, according to Article 12 of the United Nations Convention on Jurisdictional Immunities of States and Their Property, dated December 02, 2004, the Government of Ukraine, like any other foreign State, cannot invoke immunity from jurisdiction before a court of another State which is otherwise competent in a

proceeding which relates to pecuniary compensation for … damage to or loss of tangible

property, caused by an act or omission which is alleged to be attributable to the State, if the act or

omission occurred in whole or in part in the territory of that other State and if the author of the act

or omission was present in that territory at the time of the act or omission. In determining whether

a plaintiff is entitled to damages against a foreign state, it does not matter whether the state acted

in the performance of its sovereign functions, or in some other capacity.

64.     The Court also has subject matter jurisdiction over this matter since Defendants'

taking, expropriation and destruction of Plaintiffs' business and property, without just, adequate

and effective compensation, was a direct violation of customary international law. For example,

The Convention on Human Rights and Fundamental Freedoms establishes the "right not to be

deprived of [one's] property other than in public interests and on the terms envisaged by law and

general principles of international law," including the general international principle that no

taking of property shall take place without just, adequate and effective compensation.

65.     Jurisdiction also exists in this Court under the 1994 "US - Ukraine Bilateral

Investment Treaty," which prohibits state owned or controlled enterprises in Ukraine from

takings, expropriations or nationalization of property which was carried out in a discriminatory

manner without prompt, adequate and effective compensation and/or which arbitrarily and

discriminatorily impaired foreign investment.

66.     Specifically, Paragraph 7 of the US-Ukraine Bilateral Treaty provides that each

Party must provide effective means of asserting rights and claims with respect to investment,

investment agreements and any investment authorizations, and under paragraph 8, each Party

must make publicly available all laws, administrative practices and adjudicatory procedures

pertaining to or affecting investments,

67.     Article III (Expropriation) of the Bilateral Treaty incorporates into the Treaty the

international law standards for expropriation and compensation, and bars all expropriations or

22

nationalizations except those that are for a public purpose, carried out in a non-discriminatory

manner; subject to "prompt, adequate, and effective compensation." Compensation must be

equivalent to the fair market value of the expropriated investment immediately before the

expropriatory action was taken or became known (whichever is earlier); be paid without delay;

include interest at a commercially reasonable rate from the date of expropriation; be fully

realizable; be freely transferable; and be calculated in a freely usable currency on the basis of the

prevailing market rate of exchange.

68.     In addition, according to Article VIII of the Agreement on trade relations between

Ukraine and the United States, entered into on May 6, 2002:

> Citizens and companies of any Party are provided with national treatment in respect of
> access to any courts and administrative bodies in the territory of other Party as plaintiffs,
> defendants or in any other capacity. They will not claim immunity or use it in case of
> initiating the legal proceedings or execution of a judgment in the course of legal
> proceedings.

69.     In addition, jurisdiction is proper in this Court since the Government of Ukraine

has already acknowledged and determined, upon information and belief, that the Ukrainian

plaintiffs in this litigation – Luxexpress-II Ltd., Mykola Ivanenko and Larysa Ivanenko – may be

considered as "foreign entities" under Ukrainian law – and therefore have the same rights of

foreign entities, such as Plaintiff Alamo Group -- for purposes of suing the Government of

Ukraine in the U.S. courts. Specifically, on February 22, 2016, President P. Poroshenko of

Ukraine issued a Decree "On Amending the Procedure of Protection of Rights and Interests of

Ukraine during Settlement of Disputes .... ", providing, in relevant part: "For the purposes

hereof, citizens of Ukraine, legal entities of Ukraine, stateless persons shall also be considered

[to be] "foreign entities" if they present in a foreign jurisdiction body a claim against Ukraine,

which is designated to or may lead to an obligation of the state to such persons upon

consideration of the relevant claim."

70.     Upon information and belief, this this February 22, 2016 amendment of Ukrainian law was specifically designed to include the Ukrainian Plaintiffs here within the definition of "foreign entities" under the relevant Ukrainian law. Thus, under Ukrainian law, the Ukraine Ministry of Justice is authorized, among other things, to "take measures necessary to reach agreements with a foreign entity [including plaintiffs here] of dispute settlement on mutually beneficial and mutually acceptable terms .... "

71.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over claims brought under the laws of the State of New York.

72.     Venue properly lies in this Judicial District pursuant to 28  U.S.C.  §1391(b) and (c). Furthermore, there is no foreign independent or impartial forum in which to bring this action.

## RELEVANT FACTS

73.     Plaintiffs Mykola and Larysa Ivanenko founded Luxexpress-II Ltd. ("Luxexpress-II") in 1993. According to various ordinances, Luxexpress-II was permitted to use the plot of land comprising 7844 square meters located at 1 Prytchalna Street in Kharkivskyi district in the City of Kyiv for commercial purposes.

74.     On or about May 20, 1994, Defendant Ukraine and its regional/ district authorities gave their further approval to development of buildings and property on the land "for consumer goods" and for the establishment of other businesses on the property where Plaintiffs s planned to conduct their business.  See **Exhibit 8** attached hereto**.**

75.     On or about January 11, 1996, Defendant Ukraine and its regional/ district authorities gave their official "Act of Acceptance" to the "operation of finished construction of object(s), building and construction" on the land where Plaintiffs would conduct their business.

See **Exhibit 9** attached hereto.

76.     On or about January 11, 1996, Plaintiff Luxexpress-II began operation of a micro-market at its Prytchalna Street location, which comprised a single-line store for building supplies, a cafe, a warehouse and a parking lot.

77.     During 1998, corporate Plaintiff's shareholder Luxexpress- II, which intended to expand its business so as to attract foreign investors, signed two long-term land tenure agreements for the plot of land at Prytchalna Street.

78.     Under the first agreement (No. 90-5-00035), dated February 19, 1998, Luxexpress-II leased 0.5994 hectares of land for a 10-year period, which contract was extended until 2018.  Defendant Ukraine and its regional/ district authorities gave their official "Agreement" to the right of "long-term usage" for a period of 10-years of the land where Luxexpress-II intended to conduct their business.  See **Exhibit 10** attached hereto.

79.     Under the second agreement (No. 90-5-00034), also dated February 19, 1998, Luxexpress-II leased 1.6184 hectares of land for a term of 49 years, until 2047. Defendant Ukraine and its regional/ district authorities gave their official "Agreement" to the right of "long-term usage" for a period of 49-years of additional parts of the land where Plaintiffs would conduct their business.  See **Exhibit 11** attached hereto.

80.     In reliance upon these two agreements, and the protections provided by the Treaty, corporate Plaintiff's shareholder Alamo Group Inc. agreed to invest in Ukraine and to make goods, services and monies available for the development of corporate Plaintiff's business.

81.     In further reliance upon these two agreements and the protections provided by the Treaty, since 2002, corporate Plaintiff's individual shareholder Alamo Group Inc. agreed

to and did business in Ukraine, which business included (i) monies being loaned/invested from the United States to corporate Plaintiff's shareholder Luxexpress-II Ltd, (ii) goods originating in the United States being sold to the Plaintiff shareholder Luxexpress' licensed company in Ukraine and (iii) services provided from the United States to Ukraine, all of which affected commerce in the United States.

82.     The business partnership between Alamo Group and Luxexpress-II was hugely successful. The National Business Rating organization in Ukraine determined that they were one of the leading businesses in Ukraine in terms of "Volume of sold Production, Profits, Work Efficiency, and Salaries." See **Exhibit 12** attached hereto.

83.     Starting in January 2002, Alamo Group and Luxexpress-II entered into various agreements in the United States, whereby US interests and commerce would assist in the economic development of Ukraine, as it transitioned from a communist run economy to a capitalist driven and free market economy.

*84.*     The first of these was a "Loan Agreement", dated January 1, 2002, which was executed in the United States, whereby Alamo Group agreed to loan $300,000 to Luxexpress-II, which monies would be used so that good manufactured in the United States would be available for export to Ukraine. See **Exhibit 1** attached hereto. Also in January of 2002, Alamo Group entered into a "Commercial Agreement No. 1 – Delivery of Goods", where it committed to $5 million of sales and delivery of goods to Luxexpress-II in Ukraine. *Id.*

85.     In 2004, Alamo Group and Luxexpress-II decided to expand the business that would be done between the United States and Ukraine, and to specifically "expand" the Alamo Group's presence in Ukraine and expand business exports from the United States to Ukraine.

86.     In that regard, On or about August 1, 2004, Alamo Group and Luxexpress-II

entered into a lease agreement whereby Luxexpress-II leased a portion of Alamo Group's office space in Atlanta, Georgia, and Alamo Group leased some of Luxexpress-II's office space in Kiev, Ukraine. See **Exhibit 2** attached hereto.  Also on August 1, 2004, Alamo Group and Luxexpress-II entered into a "Supplementary Agreement to the Commercial Agreement No. 1 – Delivery of Goods", where Alamo Group reaffirmed its commitment to Plaintiff Luxexpress-II in Ukraine. *Id.*

87.     As part of their ongoing business relationship, Luxexpress-II made numerous wire transfers to Alamo Group's bank account in Atlanta, Georgia (See, e.g., **Exhibit 3** attached hereto), and they entered into a Sales/Marketing Agreement, effective August 1, 2004, whereby they conducted an extensive import/export business, which included the sale of automobiles and equipment to U.S. Embassies and NATO employees throughout Europe. See **Exhibit 4** attached hereto.

88.     Alamo Group's financial records reflect over $2.5 million in transactions between the two companies between August 2004 and February 2009. See **Exhibit 5** attached hereto. These transactions included the shipment of automobiles from the U.S. to Ukraine, and many of their financial transactions involved international wire transfers. See, *e.g.,* **Exhibits 6 and 7** attached hereto.

89.     When Alamo Group agreed to invest in Ukraine and entered into its business with Luxexpress-II, it was unaware that Defendant Ukraine and its national, regional and local authorities would be controlled by Defendant Yanukovych and the other individual defendants, and that these defendants were not committed to a free and open economy but, rather, to the continued corruption, expropriation of property, violation of individual rights, manipulation of the judicial system and denial of basic human rights.

27

90.     From 2002 forward, Plaintiffs Alamo Group sold and shipped cars and other merchandise to the Ukraine through its agreements with Luxexpress-II and in reliance upon the protections of their agreements, and the licenses granted by Defendants and their regional authorities.

91.     Alamo Group and Luxexpress-II also relied on the protections of the US - Ukraine Bilateral Investment Treaty ("the Treaty"), which prohibited state owned or controlled enterprises in Ukraine, including Defendants, from takings, expropriations or nationalization of property which was carried out in a discriminatory manner without prompt, adequate and effective compensation and/or which arbitrarily and discriminatorily impaired foreign investment.

92.     Specifically, Alamo Group invested substantial monies, products and services in Plaintiffs' businesses in Ukraine.

93.     Unbeknownst to Plaintiffs, during the time period that they were investing substantial sums of money, goods and services into Ukraine, the Defendants were collectively, and at the direction of the Cabinet of Ministers of Ukraine, the Prime Minister and the First Deputy Chairman of the Secretariat of the Cabinet of Ministers, engaged in the issuance of a series of unlawful order with the intent to steal Plaintiffs' property and deprive them of their businesses and investments.  To this end, Defendants concocted a fraudulent scheme to terminate the leases and property rights of Luxexpress-II, which were the basis of the investment by the Alamo Group, and to take the false and deceitful position that Plaintiffs' buildings had been unlawfully constructed on the property.

94.     Defendants' fraudulent scheme was concealed from Plaintiffs from 2003 until the end of 2011 in furtherance of the fraud, conspiracy and wrongful and illegal acts against

Plaintiffs.

95.     On December 10, 2003, Defendants' Cabinet Ministers of Ukraine issued an
Order whereby the Ministry of Transport; the Ministries of Finances, Economy, Justice and
Transport gave to the State Territorial Sectoral Association "South-Western Railway" the
authority and responsibility to construct a road and railway bridge ("the Bridge") across the
Dnieper River. See **Exhibit 13** attached hereto.

96.     Defendants thereafter used the construction of this Bridge as an excuse to
facilitate their unlawful scheme to expropriate and take Plaintiffs' property without
compensation, as well as to destroy Plaintiffs' buildings and business.

97.     Among other things, as part of Defendants' fraudulent scheme, they intended to
take – and did take – Plaintiff's property for the purpose of constructing a "tennis / sports
facility" on said property without having to compensate Plaintiffs for it. Defendants
successfully concealed this part of their unlawful scheme until 2015.

98.     On February 17, 2004, Defendants' agency, the Ministry of Transport and the
State Administration of Railway Transport of Ukraine South-Western Railway, sent Luxexpress-
II a notice that the Ministry of Transport and the Railway had the right to request that any
existing rights to use the property needed to construct the Bridge could be terminated. See
**Exhibit 14** attached hereto.

99.     However, under Ukraine law, the Treaty and under customary international law,
Luxexpress-II was entitled to compensation for the taking of its property and the losses suffered
by the Alamo Group.

100.    On April 15, 2004, Defendants' Ministry of Transport and Communication of
Ukraine and the State Administration of Railway Transport of Ukraine South-Western Railway

requested that Luxexpress-II inform defendants of how much it required as compensation for the taking of a portion of Plaintiffs' property for "construction of [an] automobile interchange." See **Exhibit 15** attached hereto.

101.     On March 14, 2005, Defendants' the Ministry of Transport and Communication of Ukraine and the State Administration of Railway Transport of Ukraine South-Western Railway, requested that Luxexpress-II inform them of how much it required as payment to transfer ownership of some of the land to which it held lawful leases so the Plaintiff's property and buildings could be acquired at a fair market rate. See **Exhibit 16** attached hereto.

102.     On December 19, 2005, Defendants' the Ministry of Transport and Communication of Ukraine and the State Administration of Railway Transport of Ukraine South-Western Railway, sent Luxexpress-II a request to notify it of the terms under which it would agree to sell its property to the Ministry of Transport, the Railway and the other regional and local authorities so the Plaintiff's property could be acquired, at a fair market rate. See **Exhibit 17** attached hereto.

103.     Plaintiffs complied with the requests from these governmental agencies and submitted their costs and the amount that would need to be paid for acquisition of the buildings, land and rights to the property upon which Plaintiffs' business and investments were based.

104.     In response to Plaintiffs' submission, on March 15, 2005, Defendants' Ministry of Transport and Communication of Ukraine and the State Administration of Railway Transport of Ukraine South-Western Railway, sent Luxexpress-II a notice that a "work group" has been formed for the "settlement of issues as for compensation costs" so the Plaintiffs' property could be acquired at a fair market rate, and so that Plaintiffs' investment was not unfairly prejudiced. See **Exhibit 18** attached hereto.

105.     After the requested submission by Luxexpress-II, on its behalf and on behalf of its

partner Alamo Group, Defendants ignored the submission and refused to pay Plaintiffs for their

business and property losses.

106.     Instead, Defendants unlawfully took Plaintiffs' property and destroyed their

businesses and investments without compensation.

107.     Luxexpress-II was forced to sue Defendants in the local courts in Kyiv. On May

18, 2006, the District Court in Kyiv awarded Plaintiffs damages in the amount of 92,436,833.00

Ukrainian Gryvnas (UAH) which, as of 2006, had an effective average exchange rate of 5 UAH

to 1 USD . See **Exhibit 19** attached hereto. Thus the award to Plaintiffs for the loss of their land,

buildings, investment and business opportunities amounted to $18,487,366.60 USD. The

damages as awarded by the Kyiv District Court were based on the Plaintiffs' official dealership

and aftersales service of Nissan and Honda cars that Alamo Group was supplying as part of its

investment in Ukraine and the agreements with Luxexpress-II that were disclosed to Defendants

in order to get its business licenses and permits.

108.     After these damages were awarded by the Kyiv District Court, Defendants refused

to pay the damages and the lost investment opportunities. Instead, Defendants' Ministry of

Transport and Communication of Ukraine and the State Administration of Railway Transport of

Ukraine South-Western Railway, appealed the Kyiv Court decision and lost again.

109.     On August 15, 2006, the Appeals Court of the Ukraine found that Defendants and

their federal, regional and local agencies unlawfully taken Plaintiffs' property without

compensation, and damaged their investments and future earnings. See **Exhibit 2**0 attached

hereto.

110.    In the appeal, Plaintiffs submitted the report of the evaluation of losses by the experts appointed by the Ukraine authorities. Those findings were that Plaintiff's shareholders had "a value of ungained profit" in the amount of $ 78,720,142 US.  See Exhibit 20 at page 16 of 17.

111.    All damages that were to be considered by the expert's commission and the Ukraine Court were based on the damages to the investments from a U.S. perspective and were expressed in US Dollars, since one of the primary factors considered was the adverse effect on US trade. The Appeals Court decision recognized that the corporate Plaintiffs' shareholders suffered losses based on invested funds of $50,000,000 USD for 2007, $26,560,000 USD for 2008 and $5,808,000 USD for 2009.

112.    The Appeals Court further acknowledged that the total damages "in the case of attraction of funds for the project of foreign credit resources" including the calculated at an interest rate of 5 % for a total of "ungained profit" of $74,601,742.00 USD as of August 2006.

113.    The August 2006 Appeals Court awarded damages in the total amount – converted back to Ukrainian Gryvnas – of 441,386,245 UAH.

114.    After the Ukraine Appeals Court confirmed, but altered slightly, the damage award, for reasons that at the time were unknown to Plaintiff or its individual shareholder, but which were later discovered to be part of the fraud, scheme, RICO enterprise as described herein, Defendants again refused to pay the damages and the loss of investment opportunity.

115.    Defendants' Ministry of Transport and Communication of Ukraine and the State Administration of Railway Transport of Ukraine South-Western Railway, appealed to the Ukraine Supreme Court.

116.    On December 27, 2006, the Ukraine Supreme Court issued an Order finding that the "civil courts" did not have jurisdiction over the case and that the case had to go to the Economic Court of the Ukraine, subject to the Code of Economic Procedure.  See **Exhibit 21** attached hereto.

117.    Upon information and belief, the Economic Court of Ukraine was one of the most corrupt courts in the Ukraine and in the entire European Union. Unbeknownst to Plaintiffs, the Economic Court was primarily operated by Defendants as a means to steal property and assets from private individuals and corporations, and to transfer the stolen property to the coffers, secret bank accounts and other holdings of Defendants and their agents.

118.    On April 4, 2007, the appointed commission regarding the construction of the Bridge concluded that the value of damages to be paid by South-Western Railway for Plaintiff's land (without consideration to additional damages) was 100,000,000 Ukrainian Gryvnas (UAH), which as of 2007 had an effective average exchange rate of 5 UAH to 1 USD.  See **Exhibit 23** attached thereto.

119.    As of April 2007, the damages for the loss of Plaintiff's land (and only the land) was $20,000,000.00 USD.

120.    On October 8, 2009, without having settled the issue of damages due to Plaintiffs and payment for the taking of Plaintiff's property, and damages to their investment and lost profits, Defendants notified Plaintiff Luxexpress-II that they were moving forward with construction of the Bridge.   See **Exhibit 24** attached hereto.

121.    Also on October 8, 2009, the Head Administration of City Planning, Architecture and Design of Urban Environment notified Plaintiffs that the construction of the Bridge could

only be done after settlement of the unresolved issue of payment due for the taking of Plaintiff's property, damages to their investment and lost profits.   See **Exhibit 25** attached hereto.

122.     On October 29, 2009, without having settled the issue of damages due to Plaintiffs and payment for the taking of Plaintiff's property, damages to their investment and lost profits, various Regional and Local Agencies notified Plaintiffs that the construction of the Bridge would "envisage partial usage of the [Plaintiff's] plot of land with demolition of buildings".   See **Exhibit 26** attached hereto.

123.     On April 22, 2010, Defendants' "State Committee of Land Resources of Ukraine Head Administration of State Committee of Land Resources Kyiv" found that Plaintiff's property was being used lawfully and that there were no violations of land legislation, meaning it was legally using and operating the land on which Defendants' Regional and Local agencies wanted to construct the Bridge without paying for it.   See **Exhibit 27** attached hereto.

124.     On October 28, 2010, Defendants' "Kyiv Council" recognized that Plaintiff's property was being used lawfully and that there were no violations of land legislation, and granted it a formal post address for its operations of a building, which included a car sales center; a service center for Nissan cars; an administrative-engineering building; an office, car sales center and service center of Honda cars and other businesses on the land on which Defendants Regional and Local agencies wanted to construct the Bridge without paying for it.   See **Exhibit 28** attached hereto.

125.     Once again, without notice to Plaintiffs, Defendants' Ministry of Infrastructure and Chairman of the City of Kyiv conspired to issue an unlawful resolution that Plaintiffs s had violated land legislation by unlawfully constructing buildings on the land that Defendants

Regional and Local agencies intended to steal from Plaintiffs so that they could construct the Bridge without any payment to Plaintiffs.   See **Exhibit 29** attached hereto.

126.     On September 19, 2011, Defendants' "Executive Organ of Kyiv City Council" found that Plaintiff's property was being used lawfully and that there were no violations of land legislation, *i.e.*, that Plaintiffs were legally using, occupying, developing and operating the land on which Defendants Regional and Local agencies wanted to construct the Bridge without paying for it.   See **Exhibit 30** attached hereto.

127.     It was not until December 23, 2011 that Plaintiff's shareholders discovered a January 2, 2003 fax by Defendant AZAROV to Defendants POPOZ, ZAKHARCHENKO, KOESNIKOV, PSHONKA and others showing that Defendants collectively, at the direction of the Cabinet of Ministers of the Ukraine, the Prime Minister and the First Deputy Chairman of the Secretariat of the Cabinet of Minister issued an illegal order confirming that they wanted to steal Plaintiff's property and deprive it of its investments and the ability to do business in Ukraine.  To this end, Defendants officially decided to terminate the leases and property rights that were lawfully entered into with Luxexpress-II, which were the basis of the investment by Alamo Group, and to take the false and deceitful position that Plaintiff's buildings had been unlawfully constructed.  See **Exhibit 31** attached hereto.

128.     On January 27, 2012, Defendant "Ministry of Internal Affairs" for the Kyiv District informed Plaintiff Luxexpress-II that if recognized that monies were owed to Plaintiffs due to losses of the land only in the amount of 100,000,000 UAH (which was then valued at $20,000,000 USD); however, the monies that were due to be paid were "spent" by officials of Defendants Railway *"for other needs but not for their purpose."* (emphasis added).  This was

Plaintiff's first notice that their monies had been embezzled, stolen or misappropriated by Defendants.  See **Exhibit 32** attached hereto.

129.     As evidenced by the January 31,2012 Letter from the General Prosecutor to the Prime Minister, the fraudulent scheme and conspiracy to steal Plaintiffs' property was directed by defendant Prime Minister of the Ukraine and carried out by the General Prosecutor himself. See **Exhibit 33** attached hereto.

130.     In addition to the development of their own business, for a substantial time period, Plaintiff Luxexpress-II worked with, solicited investments from and cooperated with the U.S. Commercial Service, which was part of the U.S. Embassy in Ukraine. Around 2007, U.S. Commercial Specialist Oleksandr (Alexander) Zavgorodniy organized a meeting during which he introduced individual Plaintiff Mykola Ivanenko to U.S. citizen and businessman Dana Anderson, who owned a construction company based in the U.S.

131.     After this initial meeting, Plaintiff Mykola Ivanenko started developing commercial relations with Anderson, including, among other things, a Harley-Davidson ("HD") motorcycle dealership on the Company's property.  Later, on February 10, 2009, plaintiff Mykola Ivanenko and Anderson met David Hackshall, regional manager of "HD" for Europe. Hackshall and other representatives of HD visited the offices of Plaintiff Luxexpress-II in Kyiv and, after a successful meeting, Mykola Ivanenko and Anderson visited Milwaukee, Wisconsin to have a look at HD's plant and museum there.

132.     As further efforts to bring U.S. investors/investments to Ukraine, Luxexpress-II also developed a business plan to build a Marriott hotel on the Company's property in Kyiv, and in 2007, they retained the architectural firm "Yezhov" to design an architectural plan for the construction of a multifunctional office-hotel complex on Plaintiff's property.

133.     In or about 2010, Plaintiff Mykola Ivanenko proposed to the Marriott Corporation

that it support the planned hotel complex project in Kyiv, and when Marriott expressed great

interest, a Marriott representative was scheduled to come to Kyiv on July 26, 2012 for a meeting.

The purpose of the meeting was to view the proposed construction site for two-tower office-hotel

complex and exhibition center.

134.     On July 25, 2012, the day before the scheduled meeting when investors Anderson

and Ivica Cacic (the Marriott representative) were to arrive in Kyiv, Plaintiffs first discovered

that their business and buildings had been totally demolished.

135.     It was only then that Plaintiffs Alamo Group and Luxexpress- II, and the

individual plaintiffs, discovered that the property in which they had invested and the commercial

buildings which they developed, and which occupied approximately 10 000 square meters, had

in fact been destroyed.

136.     According to the value estimate issued by the Right-Bank Commodity Exchange

based upon a November 6, 2012 expert evaluation, the losses and damages suffered by Plaintiff's

shareholders as a result of Defendants unlawful taking of Plaintiff's shareholders property to be a

total loss of $68,326,466.00 USD comprised of (a) Direct damage for the market value of

buildings and construction including unfinished construction was $ 11,800, 950.95 USD; and (b)

Consequential losses in the form of lost profits was $ 56,487,515.00.  See **Exhibit 34** attached

hereto.

137.     After this discovery, Plaintiffs tried to discover how it came about that their

investment and property had been taken, their buildings demolished, and their business

destroyed.

138.     From January 2013 to present, Plaintiffs gradually discovered the fraudulent

scheme and conspiracy to steal their property. They discovered that Defendants accomplished

their unlawful goals by fabricating evidence upon which the defendants Prime Minister and the

General Prosecutor would instruct the various Defendants agencies that Luxexpress-II

"unwarrantly occupied a plot of land . . . where it built non-residential building without licensing

documents", all of which was false and designed to facilitate Defendants' unlawful objective to

steal Plaintiffs' property.  See letter from General Prosecutor V. Pshonka to Defendant Mykola

Azarov, dated January 31, 2012, attached hereto as **Exhibit 39.**

139.     Defendants' plan and scheme as set forth in the Prime Minister's and Prosecutor's

January 31, 2012 Letter was also outlined in a later February 22, 2012 letter from the General

Prosecutor's Office, which explained how Luxexpress-II's land was necessary for the

"organization and execution of the Football Championship's final Europe 2012 in Ukraine" and

that Plaintiff's property continued to remain an obstacle to Defendant's scheme and plan to use

Plaintiff's property for their own purposes and for their own profit.  See **Exhibit 35** attached

hereto.

140.     Defendants' plan and scheme to deprive Plaintiffs of their business and property

without compensation was further carried out by the March 22, 2012 decision of the District

Court of Kyiv. See **Exhibit 36** attached hereto.

141.     On March 12, 2014, an expert appraiser further determined that the opportunity

costs, losses and damages suffered by Plaintiffs as a result of Defendants' unlawful taking was

$1,457, 989, 950 USD, which is what Plaintiffs would have received from "the sale of

multifunctional office and hotel complex with built-in and attached premises and parking area

subject to successful completion of its construction." The appraisal report further found that

Plaintiffs' losses were caused by Defendants' unlawful and illegal early termination of Plaintiff's shareholder's leases, licenses and agreements. See **Exhibit 37** attached hereto.

142.    On December 23, 2011, Plaintiffs learned further details regarding Defendants' unlawful scheme to deprive them of their business and property without just compensation when a letter from Defendant AZAROV dated January 2, 2003 was first publicly disclosed, which further confirmed Defendants' intentions to terminate the land plot leases of Luxexpress-II and to destroy plaintiffs' buildings and property. See Exhibit 31 attached hereto.

143.    After discovering the fraud, theft, bribery, corruption, scheme and wrongdoings against them, the individual Plaintiffs sought access to public information regarding defendants' unlawful actions and racketeering conspiracy.

144.    Plaintiffs further learned that, upon information and belief, the scheme to defraud them and to take their property without compensation was part of a larger scheme by the defendants to cover up their embezzlement and misuse of public fund in connection with the construction of the road/rail bridge being constructed adjacent to plaintiffs' property.

145.    Further evidence of the Defendants' unlawful collusion and racketeering conspiracy was recently discovered in correspondence between the General Prosecutor's Offices, documents containing directions to the Economic Court, communications with the Southern Railway officers in which they report on the status of the unlawful efforts by the Defendants to destroy Plaintiffs' buildings, take their property without compensation, destroy their investments and interfere with foreign investments and international commerce.

146.    For example, in a letter dated April 19, 2012 relating to the case before the Kyiv Economic Court of Appeals (No 01-08/137), the defendant in charge of the Court, Defendant YEMELYANOV, confirmed that the Court had received instructions from the Cabinet of

Ministers of Ukraine that the Court should not interfere with the decisions already made relating to "unauthorized occupancy" and "unauthorized construction" by Plaintiffs. See **Exhibit 38** attached hereto.

147.     After obtaining some evidence of Defendants' public corruption and fraudulent scheme to deprive them of their property without compensation, the individual Plaintiffs sought to blow the whistle on public corruption in Ukraine by releasing some of the relevant documents to the media, which gave wide coverage to Defendants' unlawful activities.

148.     Immediately thereafter, the individual Plaintiffs repeatedly received death threats from persons who, upon information and belief, were associated with the Defendants, and who sought to protect the Defendants from being investigated and prosecuted for public corruption, theft of public property, bribery and other unlawful acts.

149.     Fearing for their lives and the safety of their family, Plaintiffs Mykola and Larysa Ivanenko left Ukraine with their two children and, on October 17, 2012, sought political asylum in the United States.

150.     On March 13, 2014, Plaintiffs requested that defendant ARSENIY YATSENYUK, the Prime Minister of Ukraine, agree to the payment of the damages owed to Plaintiffs.  They received no response to this request.

151.     On March 14, 2014, Plaintiffs filed a complaint with the office of the Prosecutor General of Ukraine, and a pre-trial investigation was supposed to be started on March 16, 2014.

152.     On May 16, 2014, Plaintiffs were informed that they were recognized by the General Prosecutor of Ukraine as "victims" of a crime.

153.    However, Plaintiffs now know that Defendant VIKTOR SHOKIN, the former

Prosecutor General who was only recently removed from his post, was intentionally delaying

consideration of the case and obstructing its successful conclusion.

154.    Upon information and belief, Defendants OSTAPYNKA and other officials from

the South Western Railways bribed and/or coerced public officials to delay the payment of the

damages due to Plaintiffs for the theft and destruction of their property, unlawful taking of their

leases, and damage to their investments and business.

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF RICO, 18 USC § 1962(c)

155.    Plaintiffs reallege and incorporate herein by reference each and every

foregoing paragraph of this Second Amended Complaint as if set forth herein.

156.    18 USC § 1961 et seq. provides, in pertinent part, that:

> (1) "racketeering activity" means (A) any act or threat involving . . . bribery,
> extortion . . .  (B) any act which is indictable under any of the following
> provisions of title 18, United States Code: Section 201 (relating to bribery) . . .
> section 1341 (relating to mail fraud), section 1343 (relating to wire fraud) . . .
> section 1503 (relating to obstruction of justice), . . . section 1951 (relating to
> interference with commerce, robbery, or extortion), section 1952 (relating to
> racketeering) . . . section 1957 (relating to engaging in monetary transactions in
> property derived from specified unlawful activity) . . .

> (2) "State" means any State of the United States, the District of Columbia, the
> Commonwealth of Puerto Rico, any territory or possession of the United States,
> any political subdivision, or any department, agency, or instrumentality thereof;

> (3) "person" includes any individual or entity capable of holding a legal or
> beneficial interest in property;

> (4) "enterprise" includes any individual, partnership, corporation, association, or
> other legal entity, and any union or group of individuals associated in fact
> although not a legal entity;

> (5) "pattern of racketeering activity" requires at least two acts of racketeering
> activity, one of which occurred after the effective date of this chapter and the last

of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity . . .

157.    18 USC § 1962, provides, in pertinent part, that

(a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity . . .  (and use or investment), directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce . . .

(b) It shall be unlawful for any person through a pattern of racketeering activity . . . to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce . . .

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . .

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

158.    18 USC § 1341 – Frauds and Swindles - provides, in pertinent part, that:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, . . . for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both.

159.    18 USC § 1343 – Fraud by Wire, provides, in pertinent part, that:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of

executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

160.    18 USC § 1349 – Attempts and Conspiracy - provides, in pertinent part, that:

> Any person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

161.    At all relevant times, Plaintiffs Luxexpress 2016 Corp, Alamo Group and Luxexpress II, and the two individual Plaintiffs were persons within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

162.    As a general matter and by way of summary of the facts set forth elsewhere herein:

    a.  Defendants engaged in a fraud, scheme and criminal enterprise to steal Plaintiffs' property, to cause damage to Plaintiffs' foreign investments, to prevent Plaintiffs from have access to fair and impartial tribunals, to prevent Plaintiffs from having effective remedies for the taking of their property and to recover damages to their investments.

    b.  The fraud, scheme and criminal enterprise included:

        (1)    Bribery of public officials involved with Plaintiffs' business between the United States and Ukraine;

        (2)    Creation of fabricated and false evidence regarding Plaintiffs' business between the United States and Ukraine and specifically the business licenses, leases and permits to build and conduct their business;

        (3)    Concealment of evidence regarding Defendants' theft of Plaintiffs' property, and the extent of Plaintiffs' business transactions between the United States and Ukraine;

        (4)    Unlawful and illegal manipulation of court proceedings regarding Plaintiffs' business between the United States and Ukraine, Defendants' theft of Plaintiffs' property and the Defendants unlawful refusal to pay for the property stolen and expropriated without due process;

        (5)    Deceit and interference with the export and shipments of products, goods and services from the United States to Ukraine related to Plaintiffs' business between the United States and Ukraine;

(6)     Interference with products and services to be provided and supplied to U.S. businesses and governmental entities doing business in Ukraine and elsewhere in Eastern Europe by Plaintiffs;

(7)     Interference with investments by U.S. manufacturers, sellers of cars and motorcycles regarding Plaintiffs' business between the United States and Ukraine;

(8)     Interference with investments by U.S. hotel companies and real estate developers regarding Plaintiffs' business between the United States and Ukraine;

(9)     Intimidation and threats of serious injury, death or other violence to the individual Plaintiffs; and

(10)    Laundering of currency and assets in and/or through U.S. banks and clearing houses which Defendants unlawfully obtained in connection with the corrupt and fraudulent scheme to unlawfully take Plaintiffs' property without compensation and then to obtain bribe money and other unlawful proceeds for the use of the property that was unlawfully taken.

c.  The fraud, scheme and criminal enterprise required and depended upon the exchange of email, faxes, telephone calls, and other electronic communications, as well as the use of mail.

159.    At all relevant times, each Defendant (sometimes referred to as "RICO Defendant") was a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

160.    As explained below, the RICO Defendants violated 18 USC § 1962 (a) as a result of their receipt of ". . . income derived, directly or indirectly, from a pattern of racketeering activity . . . [and use or investment] directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect . . . foreign commerce . . ." involving the Plaintiffs' business between the United States and Ukraine.

161.    As explained in further detail below, the Defendants violated 18 USC § 1962 (b) as a result of their acquiring and maintaining "directly or indirectly, (an) interest in (and) control of (an) enterprise which is engaged in, or the activities of which affect . . . foreign commerce . . . " involving Plaintiffs' businesses in and between the United States and Ukraine.

162.     As explained in greater detail below, the RICO Defendants violated 18 USC § 1962 (c) as a result of their being *" . . . employed by (and) associated with any enterprise engaged in, or the activities of which affect . . . foreign commerce" and conducted and participated "directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ."* all of which was designed to steal and destroy Plaintiffs' investments and businesses in and between the United States and Ukraine. \

163.     he RICO Defendants violated 18 USC § 1962 (d) as a result of their conspiring "to violate . . . the provisions of (1962) subsection (a), (b), or (c)".

164.     The Defendants violated 18 USC § 1341 in that they "devised . . . (a) scheme or artifice to defraud . . . [to obtain] money or property by means of false or fraudulent pretenses, representations, or promises . . ." and used post offices and other authorized depositories for mail that was sent or delivered by private and commercial interstate carriers between the United States and Ukraine in furtherance of the fraud, scheme and illegal enterprise to steal and destroy Plaintiffs' investments and businesses between the United States and Ukraine.

165.     As explained herein and below, the Defendants violated 18 USC § 1343 in that their "scheme and artifice to defraud . . . [and to obtain] money and property by means of false or fraudulent pretenses, representations, or promises" was carried out through the transmittal of emails, faxes and other communications by wire regarding the foreign commerce between the United States and Ukraine in furtherance of the fraud, scheme and illegal enterprise to steal and destroy Plaintiffs' investments and businesses in and between the United States and Ukraine.

166.     As explained herein and below, the RICO Defendants violated 18 USC § 1349 by conspiring with one another to further the fraud, scheme and illegal enterprise, and to commit the unlawful and illegal racketeering acts designed to steal and destroy Plaintiffs' investments and businesses in and between the United States and Ukraine.

**The RICO Enterprise**

167.    The RICO Defendants and their co-conspirators are a group of persons associated together in fact for the common purpose of carrying out an ongoing criminal enterprise, as described in the foregoing paragraphs of this Second Amended Complaint; namely, through a multi-faceted campaign of lies, fraud, threats, official corruption, creation of false documents, manipulation of process, interference with rights, unlawful taking, expropriations and interference with contracts and business opportunities, through which they caused U.S. companies, such as Plaintiff Alamo Group to invest substantial sums in Ukraine, to ship valuable products and goods to Ukraine, to commit to the development of property in Ukraine and to then steal the investments, revenues and property of Plaintiffs, thereby fraudulently and illegally enriching the RICO Defendants and their co-conspirators.

168.    These RICO Defendants and their coconspirators organized their operation into a cohesive group with specific and assigned responsibilities and a command structure, operating in Ukraine and reaching into the United States, funded primarily with assets sent to Ukraine and then stolen and unlawfully taken by Defendants, monies wired to Ukraine and then unlawfully taken by Defendants, and property and investments acquired in Ukraine through monies, goods and services originating in the United States.

169.    During the period from 2002 to 2010, the RICO Defendants adapted their plan and scheme to changing circumstances, recruiting new members to their operation, and expanding the scope and nature of their activities.

170.    While the organization of the criminal enterprise changed over time, and its members may have held different roles at different times, the criminal enterprise has generally been structured to operate as a unit in order to accomplish the goals of their criminal scheme:

a.      The Departments, Ministries, Agencies and Organs of Defendant Ukraine and

in particular the Office of the President of Ukraine, Ministry of Transport of Ukraine, Ministry of Internal Affairs of Ukraine, Ministry of Infrastructure of Ukraine, Ministry of Justice of Ukraine, and the Economic Court of Ukraine were responsible for general oversight of the scheme to defraud and extort Plaintiffs, and have directed the other conspirators and in particular the Office of the Prime Minister of Ukraine, the Cabinet of Ministers of Ukraine, the Ministry of Transport and Communications of Ukraine, the State Territorial-Sectoral Association/ State Administration of Railway Transport of Ukraine a/k/a "South-Western Railway, the State Committee of Land Resources of Ukraine, the General Prosecutor of Ukraine, the Kyiv City/State Administration, and Head Administration of City Planning, Architecture and Design of Urban Environment to take actions necessary to accomplish the overall aims of the fraudulent scheme, conspiracy and criminal enterprise to steal, take and expropriate Plaintiffs' property, damage their investments, interfere with their contracts, destroy their business opportunities and steal their money.

b.  While the Office of President of Ukraine was ultimately responsible for general oversight of the scheme to defraud and extort Plaintiffs and directed the other individual conspirators Viktor Yanukovich, Alexander Yanukovich, Mykola Azarov, Alexey Azarov, Yury Anistratenko, Valeriy Khoroshkovskiy, Andrew Klyuyev, SergeyKlyuyev, Vitaliy Zakharchenko, Viktor Pshonka, Artem Pshonka, Renat Kuzmin, Anatoliy Melnik, Vladimir Gogol, Olena Lukash, Victor Tatkov, Artur Yemelyanov, Boris Lilesnikov, Vladimir Kozak, Alexey Kryvopishin, Alexsander Rybak, Alexander Popov, Anatoliy Golubchenko, Galina Gerega,  Leonid Chernivetshiy, Sergey Kurchenko, Arseny Yatsenyk, Viktor Shokin, and Boris Ostapyuk to take actions

necessary to accomplish the overall aims of the fraudulent scheme, conspiracy and criminal enterprise to steal, take and expropriate Plaintiff's shareholder's property, damage their investments, interfere with their contracts, destroy their business opportunities and steal their money.

c.  The Departments, Ministries, Agencies and Organs of Defendant Ukraine and in particular the Ministry of Transport of Ukraine, the Ministry of Internal Affairs of Ukraine, and the Ministry of Infrastructure of Ukraine directed the State Territorial-Sectoral Association/State Administration of Railway Transport of Ukraine a/k/a "South-Western Railway, State Committee of Land Resources of Ukraine, the General Prosecutor of Ukraine, the Kyiv City/State Administration, and the Head Administration of City Planning, Architecture and Design of Urban Environment to take actions necessary to accomplish the overall aims of the fraudulent scheme, conspiracy and criminal enterprise to steal, take and expropriate Plaintiff's shareholder's property, damage their investments, interfere with their contracts, destroy their business opportunities and steal their money.

d.  The Departments, Ministries, Agencies and Organs of Defendant Ukraine, specifically the State Territorial-Sectoral Association/State Administration of Railway Transport of Ukraine a/k/a "South-Western Railway, State Committee of Land Resources of Ukraine, the General Prosecutor of Ukraine, the Kyiv City/State Administration, and the Head Administration of City Planning, Architecture and Design of Urban Environment followed the directives of the Ukraine Government and in particular the Office of the President, the General Prosecutor's Office, the Ministry of Transport of Ukraine, the Ministry of Transport of Ukraine, the Ministry of Internal Affairs of Ukraine, and the Ministry of Infrastructure of Ukraine and falsified reasons and alleged

justifications in furtherance of the scheme to defraud and extort Plaintiffs

through which they and the other conspirators took actions in furtherance of

fraudulent scheme, conspiracy and criminal enterprise to steal, take and

expropriate Plaintiff's shareholder's property, damage their investments, interfere

with their contracts, destroy their business opportunities and steal their money.

e.  The Departments, Ministries, Agencies and Organs of Defendant Ukraine and

each of the defendants individually and collectively conspired to falsify

documents, make false claims regarding Plaintiffs' rights as part of the

scheme to defraud and extort Plaintiffs, and took actions necessary to

accomplish the overall aims of the fraudulent scheme, conspiracy and criminal

enterprise to steal, take and expropriate Plaintiffs' property, damage their

investments, interfere with their contracts, destroy their business opportunities

and steal their money.

f.  The Defendants were responsible for asserting totally false and fabricated

reasons in justification of their fraudulent scheme, conspiracy and criminal

enterprise to steal, take and expropriate Plaintiffs' property, damage their

investments, interfere with their contracts, destroy their business opportunities

and steal their money.

g.  As part of the fraudulent scheme, conspiracy and criminal enterprise to steal,

take and expropriate Plaintiffs' property, damage their investments, interfere with

their contracts, destroy their business opportunities and steal their money,

Defendants used letters, wires, faxes and other means of communications

to accomplish their fraudulent scheme and enterprise.

h.  Defendants were primarily responsible for managing the RICO enterprise

by exerting influence over and colluding with the Ukraine government and

court officials, in furtherance of the criminal enterprise in which they have made false statements to Plaintiffs,  to US officials in Ukraine, to U.S. companies considering investing in Ukraine in furtherance of the RICO Defendants' racketeering activities in Ukraine, which induced Plaintiff Alamo Group and other U.S. companies to transfer goods, services and money out of the United States to Ukraine, where they could be unlawfully taken stolen and expropriated.

i. Individual Defendants Viktor Yanukovich, Alexander Yanukovich, Mykola Azarov, Alexey Azarov, Yury Anistratenko, Valeriy Khoroshkovskiy, Andrew Klyuyev, Sergey Klyuyev, Vitaliy Zakharchenko, Viktor Pshonka, Artem Pshonka, Renat Kuzmin, Anatoliy Melnik, Vladimir Gogol, Olena Lukash, Victor Tatkov, Artur Yemelyanov, Boris Lilesnikov, Vladimir Kozak, Alexey Kryvopishin, Alexsander Rybak, Alexander Popov, Anatoliy Golubchenko, Galina Gerega,  Leonid Chernivetshiy, Sergey Kurchenko, Arseny Yatsenyk, Viktor Shokin, and Boris Ostapyuk served as a conduit for one another in the funding and otherwise furthering the RICO Defendants' criminal  enterprise.

j. Individual Defendants Viktor Yanukovich, Alexander Yanukovich, Mykola Azarov, Alexey Azarov, Yury Anistratenko, Valeriy Khoroshkovskiy, Andrew Klyuyev, SergeyKlyuyev, Vitaliy Zakharchenko, Viktor Pshonka, Artem Pshonka, Renat Kuzmin, Anatoliy Melnik, Vladimir Gogol, Olena Lukash, Victor Tatkov, Artur Yemelyanov, Boris Lilesnikov, Vladimir Kozak, Alexey Kryvopishin, Alexsander Rybak, Alexander Popov, Anatoliy Golubchenko, Galina Gerega,  Leonid Chernivetshiy, Sergey Kurchenko, Arseny Yatsenyk, Viktor Shokin, and Boris Ostapyuk, in their capacities

officials of and/or working at the direction of the Office of the Prime
Minister of Ukraine, the Cabinet of Ministers of Ukraine, the Ministry of
Transport and Communications of Ukraine, the State Territorial-Sectoral
Association/ State Administration of Railway Transport of Ukraine a/k/a "South-
Western Railway, the State Committee of Land Resources of Ukraine, the
General Prosecutor of Ukraine, the Kyiv City/State Administration, and Head
Administration of City Planning, Architecture and Design of Urban Environment
were responsible for coordinating the drafting of false reports, documents
and other materials sent to Plaintiffs, Plaintiffs' banks in the U.S. and
others in the U.S.

171.    The RICO Defendants and their co-conspirators constitute an association-
in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), referred to
hereinafter as the "Enterprise."

172.    Each of the RICO Defendants participated in the operation or management of
the Enterprise.

173.    At all relevant times, the Enterprise was engaged in, and its activities affected
interstate and foreign commerce within the meaning of 18 USC § 1962(c).

**Pattern of Racketeering Activity**

174.    The RICO Defendants conducted or participated, directly or indirectly, in the
conduct, management, or operation of the Enterprise's affairs through a "pattern of
racketeering activity" within the meaning of 18 USC § 1961(5) and in violation of 18 USC §
1962(c).

**Pattern of Racketeering Activity:  Extortion in Violation of Hobbs Act 18 USC § 1951**

175.    At all times material to this Second Amended Complaint, Plaintiffs were
engaged in interstate and foreign commerce, including the import, sale, after-market sales,

51

service and maintenance for "Honda", "Nissan" and "KIA" cars, including cars for the use by U.S. state department and its officials in Ukraine,  development of U.S. hotel affiliates and properties in Ukraine, development of U.S. motorcycle dealerships and sales in Ukraine, all of which affected interstate and foreign commerce between the United States and Ukraine.

176.    As described herein, the RICO Defendants engineered a wide-ranging campaign of false and misleading written statements, trumped up allegations, initiation of baseless regulatory charges, investigations by government agencies, and ongoing harassment and disruptions of business operations, including the demand of payments disguised as "fines" and other "fees" under false pretenses, with the understanding that these unlawful actions and activities would cease if such payments were made by Plaintiffs, all with the intent and effect of causing a reasonable fear of economic loss, damage to foreign investments, and the taking and destruction of Plaintiffs' property.

177.    As described herein, the RICO Defendants manufactured false "evidence" against Plaintiffs, which they relied upon to manufacture the false argument in the Civil Courts and the Economic Court of Ukraine to the effect that Plaintiffs violated leases and business licenses, and that they unlawfully constructed and operated businesses. These courts were controlled by Defendants and their co-conspirators, and all of these unlawful actions were taken with the intent and effect of causing fear of economic loss, damage to foreign investments, and the taking and destruction of Plaintiffs' property.

178.    As described herein, the RICO Defendants conspired with one another as officials, agencies, and instrumentalities of Ukraine to advance baseless claims against Plaintiffs as part of their fraudulent scheme and enterprise, and they took such actions as necessary to accomplish the overall aims of the fraudulent scheme and criminal enterprise, which was to steal, take and expropriate Plaintiffs' property, damage their investments, interfere with their contracts, destroy their business opportunities and steal their money.

179.    The RICO Defendants' actions were intended to induce fear by Plaintiffs that the RICO Defendants would, among other things: (i) continue to pursue a scheme of misrepresentation to the great harm and public denigration of Plaintiffs, unless and until Plaintiffs agreed to forego their claims to an award of damages, as found by the independent experts and as ordered in the several Court proceedings in Ukraine from 2010 to 2014, as compensation for the unlawful destruction of buildings on Plaintiffs' property, expropriation of Plaintiffs' property without payment, damage to Plaintiffs' investments, interference with Plaintiffs' contracts, interference with Plaintiffs' multi-year leases and damages to business opportunities; (ii) continue to conspire with other Ukraine officials, agencies and instrumentalities of government to have Plaintiffs subjected to claims based upon falsified evidence; and (iii) secure a fraudulent judgment against Plaintiffs in furtherance of the fraudulent scheme, conspiracy and criminal enterprise to steal, take and expropriate Plaintiffs' property, damage their investments, interfere with their contracts, destroy their business opportunities and steal their money. These actions, as described herein, had the intent and effect of causing fear of economic loss, damage to foreign investments and the taking and destruction of Plaintiffs' property, and did, in fact, create such a reasonable fear of harm on the part of Plaintiffs.

180.    Accordingly, the RICO Defendants unlawfully obstructed, delayed, and affected and attempted to obstruct, delay, and affect interstate and foreign commerce as that term is defined  in  18 USC § 1951, and the movement of articles and commodities in such commerce, by extortion, as that term is defined in § 1951, in that the RICO Defendants attempted to induce Plaintiffs to consent to relinquish property through the wrongful use of threatened force, violence, and fear, including fear of economic  harm.

**Pattern of Racketeering Activity:**
**Violation of New York Penal Law §§ 110.00, 155.05(2), 155.42**

181.    New York Penal Law § 110.00 provides that:

53

A person is guilty of an attempt to commit a crime when, with intent to commit a crime, he engages in conduct which tends to effect the commission of such crime.

182.    New York Penal Law § 155.05 provides that:

1. A person steals property and commits larceny when, with intent to deprive another of property or to appropriate the same to himself or to a third person, he wrongfully takes, obtains or withholds such property from an owner thereof. 2. Larceny includes a wrongful taking, obtaining or withholding of another`s property, with the intent prescribed in subdivision one of this section, committed in any of the following ways: (a) By conduct heretofore defined or known as common law larceny by trespassory taking, common law larceny by trick, embezzlement, or obtaining property by false pretenses . . . .

183.    New York Penal Law § 155.42 provides that:

A person is guilty of grand larceny in the first degree when he steals property and when the value of the property exceeds one million dollars.

184.    The RICO Defendants stole Plaintiffs' property by (i) wrongfully taking it, (ii) obtaining it unlawfully without payment, (iii) by withholding it from Plaintiffs without payment, and (iv) by treachery, embezzlement, and use of false pretenses to obtain Plaintiffs' property, in violation of New York Penal Law §§ 110.00 and l55.05(2).

185.    The RICO Defendants' theft and retention of Plaintiffs' property was also conducted by instilling fear that if the Plaintiffs did not cease their efforts to collect damages, that the RICO Defendants would perform acts calculated to harm Plaintiffs physically and materially with respect to their business, financial condition and reputation in New York and elsewhere, and such conduct violated New York Penal Law §§ 110.00 and l55.05(2).

186.    The RICO Defendants' theft and retention of Plaintiffs' property valued in excess of $1 million is grand larceny in violation of New York Penal Law § 155.42.

## Pattern of Racketeering Activity:
## Multiple Instances of Mail and Wire Fraud in Violation of 18 USC §§ 1341, 1343

187.    As described herein, the RICO Defendants engaged in a wide-ranging scheme or artifice to defraud Plaintiffs, various courts of law, and the public, including the U.S.

State Department and the U.S. corporate community, including leaders in the automotive

export, sales, after-market and service community, leaders in international sales of U.S.

motorcycles, leading U.S. hotel chains, concerning Plaintiffs alleged violations of Ukrainian

laws, including alleged violations of Ukraine's licensing, regulatory and business

operations, all of which was done by manufacturing evidence and colluding with the court

officials and appointed experts.

188.    The ultimate objective of the RICO Defendants' scheme and artifice to

defraud was to coerce Plaintiffs into foregoing and/or abandoning their claims to an award

of damages – as found by the independent experts and as ordered in several of the court

proceedings in Ukraine from 2010 to 2014 – as compensation for the unlawful destruction

of buildings on Plaintiffs' property, expropriation of Plaintiffs' property without

compensation, damage to Plaintiffs' investments, interference with Plaintiffs' contracts,

interference with Plaintiffs' multi-year leases and damages to business opportunities.

189.    In furtherance of their fraudulent scheme, and as described herein, the RICO

Defendants transmitted, or caused to be transmitted, by means of wire communication in

interstate or foreign commerce, writings, signs, signals, pictures, and sounds, and also

caused matters and things to be placed in any postal facilities or authorized depositories, or

deposited or caused to be deposited matters or things to be sent or delivered by a private or

commercial interstate and international carrier, including, but not limited to, the following:

(a) emails and website postings incorporating false and misleading statements regarding

Plaintiffs' violation of their use of licenses, unlawful construction and improper business

operations; (b) wirings and/or mailings between and among the RICO Defendants

concerning the preparation of reports that were transmitted in Ukraine and to the United

States to Plaintiffs, investors, suppliers, customers, investors, and existing and potential

business partners in the United States; (c) communications directed toward U.S. state and

federal government officials and regulators incorporating false and misleading statements alleging that Plaintiffs had violated licenses, engaged in unlawful construction and conducted improper business operations; and (d) other electronic communications containing false and misleading statements intended to cause damage to foreign investments, the expropriation of Plaintiffs' property without compensation, interference with Plaintiffs' contracts, and interference with Plaintiffs' multi-year leases and damages to business opportunities.

190.    Plaintiffs incorporate by reference each of the Exhibits attached hereto which show the uses of wire and mail communications in furtherance of the RICO Defendants' scheme or artifice to defraud that constitute violations of 18 USC §§ 1341 and 1443, and which also show the specific defendant who caused the communication to be mailed, wired or transmitted, when the communication was made, and how it furthered the fraudulent scheme.

191.    The RICO Defendants participated in the scheme or artifice knowingly, willfully, and with the specific intent to deceive and/or defraud Plaintiffs into investing substantial monies to develop business between the United States and Ukraine, in particular the import, sale, after-market sales, service and maintenance for cars manufactured in and/or shipped from the U.S., including cars for the use by U.S. State Department and other officials in Ukraine and elsewhere in Eastern Europe,  the development of U.S. hotel affiliates and properties in Ukraine, the development of U.S. motorcycle dealerships and sales in Ukraine, and the promotion of interstate and foreign commerce between the United States and Ukraine.

192.    The RICO Defendants actions described herein were knowing and intentional and in furtherance of their scheme or artifice to defraud and/or coerce Plaintiffs into foregoing their claims to award of damages – as found by the independent experts and as ordered in the several court proceedings in Ukraine from 2010 to 2014 – as compensation

for the unlawful destruction of buildings on Plaintiffs' property, expropriation of Plaintiffs' property without payment, damage to Plaintiffs' investments, interference with Plaintiffs' contracts, interference with Plaintiffs' multi-year leases and damages to business opportunities.

193.    The RICO Defendants' false and misleading statements were relied upon and/or deceived (i) various courts of law, (ii) U.S. State Department officials, (iii) U.S. automotive export, sales, after-market and service companies, (iv) a U.S. motorcycle company, and (v) a leading U.S. hotel chain, and have caused Plaintiffs substantial damages.

**Pattern of Racketeering Activity:**
**Money Laundering in Violation of l8 USC § 1956 (a) (1) (A), (B) et seq.**

194.    18 USC § 1956 et seq. provides, in pertinent part, that it shall be unlawful to knowingly use:

> (a)(1) property involved in a financial transaction (that) represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity
> (A) (i) with the intent to promote the carrying on of specified unlawful activity; or. . .
> (B) knowing that the transaction is designed in whole or in part . . .
>      (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity . . .

195.    The RICO Defendants knowingly used Plaintiffs' stolen property to promote the private economic and financial interests of certain Defendants, which they did by, among other things, disguising the true origin and source and ownership of the property.

196.    Defendants have on multiple occasions, acting in their individual capacities and as agents for Ukraine, the Office of the President, the Minister of Justice, General Prosecutor and other RICO co-conspirators, knowingly caused the transport, transmission and/or transfer of funds to and/or from the United States to themselves or other entities over which they had control with the intent that those funds be used to promote the carrying on of unlawful activity in violation of 18 U.S.C. §§ 1341, 1343 and 1951, including the ongoing

fraudulent acts in the courts of Ukraine, the funding of the campaign to threaten and coerce the individual Plaintiffs and to otherwise cause damage to Plaintiffs' businesses and property.

## COUNT II

## CONSPIRACY TO VIOLATE RICO – VIOLATION OF 18 U.S.C. § 1962(d)

197.    Plaintiffs reallege and incorporate herein by reference each and every foregoing paragraph of this Second Amended Complaint as if fully set forth herein.

198.    The RICO Defendants unlawfully, knowingly and willfully combined, conspired, confederated and agreed together and with others to violate 18 USC § 1962(c) as described above, in violation of 18 USC § 1962(d).

199.    Upon information and belief, the RICO Defendants knew that they were engaged in a conspiracy to commit the predicate acts, and they knew that the predicate acts were part of such racketeering activity and that the participation and agreement of each of them was necessary to allow the commission of this pattern of racketeering activity. This conduct and the acts as described herein constituted a conspiracy to violate 18 USC § 1962(c), in violation of 18 U.S.C. § 1962(d).

200.    Upon information and belief, the RICO Defendants agreed to conduct or participate in, directly or indirectly, the conduct, management and/or operation of the Enterprise's affairs through a pattern of racketeering activity in violation of 18 USC § l962(c).

201.    Each RICO Defendant knew about and agreed to facilitate the Enterprise's scheme to steal the property from Plaintiffs. It was part of the conspiracy that the RICO Defendants and their coconspirators would commit a pattern of racketeering activity in the conduct of the affairs of the Enterprise, including the acts of racketeering set forth herein.

202.    As a direct and proximate result of the RICO Defendants' conspiracy, the acts

of racketeering activity of the Enterprise, the overt acts taken in furtherance of that conspiracy, and violations of 18 USC § 1962(d), Plaintiffs have been injured in their business and property, including damages to Plaintiffs' reputation and goodwill; the impairment of Plaintiffs' interest in executed contracts, and the attorneys' fees and costs relating to their attempts to prosecute their claims in Ukraine and to defend themselves against the RICO Defendants objectively baseless, improperly motivated sham charges and allegations in Ukraine.

203.    Pursuant to 18 USC § 1964(c), Plaintiffs are entitled to recover treble damages plus costs and attorneys' fees from the RICO Defendants.

204.    Plaintiffs are further entitled to, and should be awarded, a preliminary and permanent injunction that enjoins Defendants, their assignees and anyone else acting in concert with them from commencing, prosecuting, or advancing in any way, directly or indirectly, any further attempts to prevent Plaintiff's from enforcing and collection of the damage awards as issued by the civil courts of Ukraine in any court, tribunal, or administrative agency in any jurisdiction, in the United States or abroad.

## COUNT III

### UNLAWFUL TAKING & WRONGFUL EXPROPRIATION IN VIOLATION OF CUSTOMARY INTERNATIONAL LAW AND TREATIES

205.    Plaintiffs reallege and incorporate herein by reference each and every foregoing paragraph of this Second Amended Complaint as if set forth in full.

206.    Defendants' taking, expropriation and destruction of Plaintiffs' business and property, without just, adequate and effective compensation, was a direct violation of customary international law. For example, The Convention on Human Rights and Fundamental Freedoms establishes the "right not to be deprived of [one's] property other than in public interests and on the terms envisaged by law and general principles of international law," including the general

international principle that no taking of property shall take place without just, adequate and effective compensation.

207.    The right to receive compensation under international law for expropriated property is also recognized explicitly in Article 41 of the Constitution of Ukraine ("The expropriation of private property objects may be applied only as an exception for the reasons of social necessity, on the grounds of, and in the order established by law, and on terms of advance and complete compensation of the value of such objects").

208.    The Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1330, 1441(d), 1602 *et seq.*, provides that a foreign state and its instrumentalities are not immune from suit in United States courts "in which rights in property taken in violation of international law are in issue" and a specified commercial-activity nexus to the United States is present. 28 U.S.C. § 1605(a)(3).

209.    18 U.S.C. § 1605 provides in pertinent part:

> (a) a foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—
>
> > (1) in which the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver;
> >
> > (2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States;
> >
> > (3) in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency

or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States;

(4) in which rights in property in the United States acquired by succession or gift or rights in immovable property situated in the United States are in issue;

(5) not otherwise encompassed in paragraph (2) above, in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment; except this paragraph shall not apply to—

(A) any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused, or

(B) any claim arising out of malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights.

210.    In this case, Defendant Government of Ukraine and its departments, agencies and instrumentalities are not entitled to immunity from suit:

a. Because the acts complained of related to commercial activity carried on in the United States by the foreign state, an act performed in the United States in connection with a commercial activity elsewhere and an act outside the territory of the United States in connection with a commercial activity that act caused a direct effect in the United States;

b. Because the rights to property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state or as part of the Defendants' criminal activity and money laundering;

    c.   Because the property stolen or any property exchanged for such stolen property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States;

    d.   Because the claims are not predicated upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused rather they were intentional, wrongful and illegal acts; and

    e.   Because the claims are based upon intentional tortious acts and interference with investments and business opportunities.

211.    In this case and as demonstrated in the Facts and exhibits, Plaintiffs' claims in this matter relates to commercial activities and/or foreign commerce in which the Defendants engaged, of which they took advantage and which was affected by the Defendants wrongful acts.

212.    Specifically, Defendants unlawfully took Plaintiffs' s property so that they could turn it over and/or use it for the development of a sports complex / facility, motorcycle dealerships and/or hotel properties.

213.    The Defendants wrongful acts affected foreign commerce insofar as they interfered with foreign investments from the United States; shipments of products, goods and services from the United States and commercial development of properties, including the wrongful taking and theft of Plaintiffs' properties, which were then used by Defendants for commercial purposes.

214.    As such, Defendants wrongful acts, fraud, wrongful, unlawful acts and conspiracy against Plaintiffs was commercial in nature, for which they enjoyed no immunity.

215.    Further, the sovereign immunity relates to normal and customary acts of a sovereign or its organs, agencies and/or instrumentalities in the business of government.

216.    As set forth herein, Defendants' acts were not the normal and customary acts of a sovereign or its organs, agencies and/or instrumentalities in the business of government.  The acts involved corrupt, illegal and unlawful acts for which sovereign immunity was not and is not available.

217.    In addition, the 1994 "US - Ukraine Bilateral Investment Treaty" ("the Treaty") prohibits state owned or controlled enterprises in Ukraine, including Defendants, from takings, expropriations or nationalization of property which was carried out in a discriminatory manner without prompt, adequate and effective compensation and/or which arbitrarily and discriminatorily impaired foreign investment.

218.    One of the primary purposes of the Treaty was to protect United States companies and investors – such as corporate Plaintiff Alamo Group Inc. – when they agreed to make their goods, products, services and funds available in Ukraine, which is what the Alamo Group did when it entered into a business relationship with  Luxexpress-II.

219.    Article II of the Treaty prohibits "state owned or controlled enterprises" in the Ukraine from circumventing the obligations to not take or expropriate property within the scope of the Treaty without the payment of just compensation.

220.    Article III of the Treaty incorporates the international law standards for expropriation and compensation and prohibited expropriation or nationalization of an investment from a US business – such as Plaintiff Alamo Group Inc.-- unless "carried out in a non-discriminatory manner, subject to prompt, adequate and effective compensation" and prohibited the "arbitrary and discriminatory impairment" of the investment."

221.    Defendants violated the terms of The Treaty by among other things, discriminating against Plaintiff Alamo Group Inc., by an unlawful and illegal expropriation of the investment, failing to prevent the individual Defendants and the state owned and controlled

Defendant entities from breaching their obligations to protect the investment of Plaintiff Alamo Group Inc., refusal to comply with and interference with the prompt, adequate and effective compensation as Ordered by the Courts in Ukraine.

222. During the period after the execution of The Treaty, and in reliance upon the protections afforded by The Treaty to United States investors, such as Plaintiff Alamo Group Inc., Plaintiff Luxexpress-II made applications to the District Administration of Kyiv so as to get permission to develop land.

223. As a result, Plaintiff Luxexpress-II secured the necessary permits and licenses, and the rights to enter into the necessary land contracts from Defendant Ukraine and its regional/ district authorities to carry out Plaintiffs business plans.

224. As a result of Defendants' wrongful acts, Plaintiffs' commercial property was wrongfully, unlawfully and illegally expropriated from Plaintiffs, without prompt, adequate and effective compensation.

225. Defendants' wrongful, unlawful and illegal intentions to take Plaintiffs' property without compensation was clearly evident in numerous documents, including the January 2003 Letter from the Office of the President (**Exhibit 31**), directing the arbitrary and discriminatory taking of Plaintiffs' lands and leased property, and the destruction of buildings located on that property, all based on fabricated and false allegations.

226. The illegality of this January 2003 Order directing the taking of the Plaintiffs' property and the demolition of Plaintiffs' buildings is demonstrated by the long prior history of lawful leases, licenses and agreements entered into between Defendants and Plaintiffs.

227. From 2003 to present, in direct contradiction of the parties prior course of dealings and multiple expert's findings and valuations relating to Plaintiffs' considerable damages, Defendants have refused to pay Plaintiffs for the property that was taken, the demolition of Plaintiffs' buildings, and the destruction of their businesses.

228.    From 2003 to present, Defendants conspired with one another to prevent the fair and reasonable payment to Plaintiffs for their taking of Plaintiffs' property, the demolition of Plaintiffs' buildings and the destruction of their businesses.

229.    Defendants conduct from 2003 to present was an unlawful taking and expropriation of property in relation to Defendants' commercial activities or Defendants' interference with foreign commerce.

230.    Defendants takings also violated the protections that were afforded to Plaintiffs by 1994 Bilateral Investment Treaty, and were discriminatory.

231.    As a direct and proximate result of Defendants' unlawful actions, Plaintiffs have suffered tens of millions of dollars in damage, plus interest and costs of suit, in an amount to be determined at trial.

232.    Plaintiffs have exhausted their remedies in Ukraine and have no ability to pursue their claims in that country due to public corruption and death threats.

## COUNT IV
## (FRAUD)

233.    Plaintiffs repeat and reallege the foregoing paragraphs of this Second Amended Complaint as though fully set forth herein.

234.    Defendants engaged in a scheme to defraud Plaintiffs by first inducing them to invest huge sums of money into the development of the Plaintiffs' property in Kiev, Ukraine, with assurances that they would have long term leases on the Property, and then promising them that they would be fully compensated for that portion of the Property that was being taken, when in truth and in fact, said defendants secretly intended that Plaintiffs' property would be taken without compensation, their buildings demolished, and their businesses destroyed.

235.    During the period from 1994 through 2014, the fraud engaged by the Defendants included the following: (i) Provided documents granting approval for the development and operation of buildings and property on the land where Plaintiffs planned to conduct their

business; (ii) encouraging foreign investments and importation of goods, services and products into Ukraine based on the documents granting approval for Plaintiffs' development and operation on said Property; (iii) creating and circulating documents in which they made false allegations to the effect that the leases and licenses for the development and operation of Plaintiffs' businesses on the property should be terminated because Plaintiffs had allegedly not complied with Ukraine laws and regulations, all of which were false; (iv) creating and circulating documents through which they unlawfully terminated Plaintiffs' leases and licenses and demolished the buildings on the Property; (v) submitting false evidence and statements intending to prevent Plaintiffs from recovering the fair value for their losses resulted from Defendants' taking of their property; (vi) making false statements to dissuade U.S. companies like Harley Davidson and Marriott from making its investments in Ukraine and from entering into and/or conducting their business in Ukraine with Plaintiffs; (vii) submitting false evidence and statements to the Court Officials at the Kyiv District Court level, Kyiv Appeals Court, the Ukraine Supreme Court and then the Ukraine Economics Court, all of which were designed to prevent Plaintiffs from recovering the fair value for their losses resulted from Defendants' taking of their Property, termination of their leases and licenses and the demolition of Plaintiffs' buildings on the Property;  and (viii) making false statements to public officials that resulted in the threats and intimidation of the individual plaintiffs for the purpose of driving them out of Ukraine in the hopes that after having stolen Plaintiffs' property, destroyed their businesses, and interfered with revenue streams, sales, imports and foreign investments.

236.     As set forth above, the fraud included written and oral statements.

237.     The specific dates and the exact false statements are set forth above and in the attached exhibits, and are incorporated herein by reference.

238.     Defendants fraudulent scheme as evidenced by the Defendants' conduct, letters and documents from 1994 to 2014, and continuing to the present, was intended to defraud

Plaintiffs by first inducing them to invest huge sums of money into the development of the Property, with assurances that they would have long term leases, and then promising them that they would be fully compensated for that portion of the Property that was to be taken, when in truth and in fact, said Defendants secretly intended that Plaintiffs' businesses would be terminated and destroyed without compensation.

239.    Plaintiffs had no reason to know that Defendants' statements, licenses, leases and documents issued to Plaintiffs -- and upon which Plaintiffs invested huge sums of money, solicited foreign investments, caused shipments of goods and products from the United States to Ukraine, and upon which they could conduct their business -- were false.

240.    Plaintiffs relied upon the fraudulent misrepresentations of Defendants, to their detriment.

241.    Defendants' actions resulted in substantial financial losses to Plaintiffs, including lost income, interference with business operations, and lost business opportunities, which Plaintiffs were pursuing and would have continued to pursue but for Defendants' unlawful seizure of their business and property without compensation.

242.    Plaintiffs relied upon the fraudulent misrepresentations of defendants, to their detriment.

243.    Defendants' actions resulted in substantial financial losses to Plaintiffs, including lost income, interference with business operations, and lost business opportunities which Plaintiffs were pursuing and would have continued to pursue but for Defendants' unlawful seizure and destruction of their business and property without compensation.

244.    Plaintiffs are, therefore, entitled to an award of damages from defendants in an amount to be determined at trial.

**COUNT V**
**(ABUSE OF PROCESS)**

245.    Plaintiffs repeat and reallege the foregoing paragraphs of this Second Amended

Complaint as though fully set forth herein.

246.    Defendants and their co-conspirators caused, aided and abetted, and facilitated a gross abuse of the judicial and governmental processes by improperly influencing and manipulating the Economic Court of Kyiv and the Economic Court of Appeals into reaching politically influenced and improper decisions, declaring that the premises belonging to the Company to have been built illegally and, therefore, subject to demolition without compensation.

247.    At the time the defendants used their improper influence to obtain decisions by the two economic courts that were favorable to the defendants and which deprived plaintiffs of their property without due compensation, defendants knew, or should have known, that plaintiffs held valid long term leases on the Property and that they were lawfully operating their business on said property.

248.    As a result of defendants' gross abuse of process, Plaintiffs have suffered severe financial and business damages, as well as loss of reputation, pain and suffering, emotional damages, and other damages to their health and well-being, in amounts to be determined at trial.

## COUNT VI
## CIVIL THEFT, CONVERSION & UNJUST ENRICHMENT

249.    Plaintiffs reallege and incorporate herein by reference each and every foregoing paragraph of this Second Amended Complaint as though fully set forth herein.

250.    At all times relevant hereto, Plaintiff Luxepxress-II lawfully held leases, licenses and permits to possess and operate Plaintiffs' property located in Kyiv, at 1 Prytchalna St., which is on the bank of the Dnieper River in Kiev ("the Property").

251.    At all times relevant hereto, Plaintiffs conducted their business on said Property.

252.    At all times relevant hereto, Plaintiffs had a possessory right or interest in the Property.

253.    At all times relevant hereto, Defendants unlawfully exerted dominion and control over the Property and took possession of it, thereby interfering with Plaintiffs' possessory rights and interest to the Property.

254.    Defendants' taking of said property was wrongful, unlawful and illegal, and damaged Plaintiff's business and investments.

255.    Defendants failed and refused to pay prompt, effective and adequate compensation for the Property that they took.

256.    Defendants' actions in taking possession of Plaintiff's aforesaid Property and interference with Plaintiffs' operation of their business operations on said Property resulted in substantial financial losses to Plaintiffs, including lost income, interference with business operations, and lost business opportunities which Plaintiffs were pursuing and would have continued to pursue but for Defendants' unlawful taking and seizure of their business and property without compensation.

257.    Plaintiffs are entitled to an award of damages from defendants in an amount to be determined at trial.

## JURY TRIAL DEMAND

258.    Plaintiffs demand trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, by and through their attorneys, demand judgment against each of the Defendants, as follows:

a. Judgment in favor of Plaintiffs;

b. An award of treble damages as to each of Counts I and II (Civil RICO);

c. An award of compensatory and punitive damages on Counts III and IV;

d. An award of attorneys' fees and costs incurred in pursuing this action; and

e. A grant of such other and further relief as this Court deems just and proper.

Dated:  New York, New York
        November 21, 2016

                    McCALLION & ASSOCIATES LLP


            _____/s/_____
            Kenneth F. McCallion (Bar # KFM-1591)
             100 Park Ave, 16th floor
            New York, NY 10017-5538
            (646) 366-0880
            Attorney for Plaintiffs