# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

|   |   |   |
|---|---|---|
| ) |   |   |

**LUXEXPRESS 2016 CORP.,** *et al.*,   )

                Plaintiffs,           )

               v.                   )       Civil Action No. 18-cv-812 (TSC)

**GOVERNMENT OF UKRAINE,** *et al.*,  )

               Defendants.      )

## MEMORANDUM OPINION

Plaintiffs Luxexpress-II Ltd., Luxexpress 2016 Corporation, Alamo Group Inc., Mykola Ivanenko, and Larysa Ivanenko, have sued the government of Ukraine, thirty Ukrainian individuals, and twenty John Doe Defendants, alleging that they unlawfully expropriated and destroyed Plaintiffs' property in Kyiv, Ukraine. (ECF No. 41 ("2d Am. Compl.") ¶ 1.) The government of Ukraine moves, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), to dismiss the Second Amended Complaint, arguing it is immune from suit in the United States.[1] (ECF No. 63 ("Def. Mot.").) Upon consideration of the motion and the parties' briefs, and for the reasons set forth below, the court will GRANT Ukraine's motion to dismiss.

## I.     BACKGROUND

Plaintiffs Mykola Ivanenko and Larysa Ivanenko (collectively, the "Ivanenkos") are Ukrainian nationals who reside in New York and have applied for political refugee status in the United States. (2d Am. Compl. ¶¶ 20–21.) Before moving to the United States, the Ivanenkos

---

[1] Ukraine's request for oral argument on its motion to dismiss is denied in light of the ample briefing submitted by the parties. *See* LCvR 7(f) (providing that oral hearing "shall be within the discretion of the Court").

owned and operated Luxexpress-II, Ltd., an automobile import business in Kyiv, Ukraine. (*Id.* ¶ 22.) Luxexpress-II imported some of its cars through Alamo Group, Inc., a U.S.-based company that is incorporated and headquartered in Georgia. (*Id.* ¶ 19.) Alamo Group and Luxexpress-II conducted other business together, including Alamo Group's loan of approximately $300,000 to Luxexpress-II in 2002, and the two companies leased office space from each other in Atlanta and Kyiv. (*Id.*) In addition, both Alamo Group and Luxexpress-II are shareholders in Luxexpress 2016 Corporation, a company incorporated and based in New York. (*Id.* ¶ 18.) Luxexpress 2016 is the owner and successor in rights to Luxexpress-II. (*Id.*)

Through a series of ordinances and agreements, Luxexpress-II leased land in downtown Kyiv from the Kyiv City State Administration to operate its business. (*Id.* ¶¶ 73–75, 78, 79, Exs. 10, 11.) The leases, signed in 1998, gave Luxexpress-II terms of ten and forty-nine years. (*Id.* ¶¶ 78, 79). In 2004, Luxexpress-II learned from Ukraine's state railway, the State Administration of Railway Transport of Ukraine South-Western Railway ("South-Western Railway"), that the government intended to build a bridge over the Dneiper river, and parts of Luxexpress-II's leased plots were in the construction zone. (*Id.* ¶¶ 95, 98, 100.) Over the next few years, the parties engaged in discussions about compensating Luxexpress-II for the taking of the property. (*Id.* ¶¶ 101–04.) Luxexpress-II eventually sued in Ukrainian court to obtain compensation for the impending loss of the land. (*Id.* ¶¶ 107–119.) As plans to construct the bridge progressed, Luxexpress-II remained on the land and sought to expand its operations by constructing new buildings. (*Id.* ¶¶ 123–24, 130–32; ECF No. 69-2 ("Ivanenko Decl.") ¶ 3.) In 2012, Defendants terminated Luxexpress-II's lease and demolished the buildings on the land. (2d Am. Compl. ¶ 127, Ex. 31.) On July 25, 2012, the Ivanenkos discovered the buildings had been demolished and other Luxexpress-II property destroyed. (*Id.* ¶ 134; Ivanenko Decl. ¶ 5.)

Plaintiffs allege the taking—cancellation of the lease and demolition of the property—had a "direct adverse impact on rights and interests of Plaintiffs and their business relations in the United States" because the alleged conduct "interfered with their business relationships with United States corporations." (2d Am. Compl. ¶ 12.) Plaintiffs claim they "suffered millions of dollars in damages from property seizures, destruction of property, cancellation of property rights, voiding of lease and contract rights, and interference with and/or discrimination against business investments." (*Id.* ¶ 15.)

Plaintiffs assert six claims against Defendants: violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, (Count I); conspiracy to violate RICO (Count II); unlawful taking and wrongful expropriation in violation of customary international law (Count III); fraud (Count IV); abuse of process (Count V); and civil theft, conversion, and unjust enrichment (Count VI).

## II.    LEGAL STANDARD

### A. <u>**Motion to Dismiss for Lack of Subject-Matter Jurisdiction**</u>

Federal courts are of limited jurisdiction and "may not exercise jurisdiction absent a statutory basis." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 552 (2005). "Limits on subject-matter jurisdiction 'keep the federal courts within the bounds the Constitution and Congress have prescribed,' and those limits 'must be policed by the courts on their own initiative.'" *Watts v. SEC*, 482 F.3d 501, 505 (D.C. Cir. 2007) (quoting *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999)). Such limits are especially important in the agency review context, where "Congress is free to choose the court in which judicial review of agency decisions may occur." *Am. Petroleum Inst. v. SEC*, 714 F.3d 1329, 1332 (D.C. Cir. 2013) (internal quotation marks omitted) (quoting *Watts*, 482 F.3d at 505). The law presumes that "a

cause lies outside [the court's] limited jurisdiction" unless the party asserting jurisdiction establishes otherwise. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (citation omitted). Thus, plaintiffs bear the burden of establishing jurisdiction by a preponderance of the evidence. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *Shekoyan v. Sibley Int'l Corp.*, 217 F. Supp. 2d 59, 63 (D.D.C. 2002).

In evaluating a motion to dismiss for lack of jurisdiction under Federal Rule of Civil Procedure Rule 12(b)(1), a court must "assume the truth of all material factual allegations in the complaint and 'construe the complaint liberally, granting plaintiff[s] the benefit of all inferences that can be derived from the facts alleged.'" *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005)). But the court "need not accept factual inferences drawn by plaintiffs if those inferences are not supported by facts alleged in the complaint, nor must the Court accept [plaintiffs'] legal conclusions." *Disner v. United States*, 888 F. Supp. 2d 83, 87 (D.D.C. 2012) (quoting *Speelman v. United States*, 461 F. Supp. 2d 71, 73 (D.D.C. 2006)). A motion to dismiss under 12(b)(1) "is not limited to the allegations of the complaint." *Hohri v. United States*, 782 F.2d 227, 241 (D.C. Cir. 1986), *vacated on other grounds*, 482 U.S. 64 (1987). And "a court may consider such materials outside the pleadings as it deems appropriate to resolve the question [of] whether it has jurisdiction to hear the case." *Scolaro v. D.C. Bd. of Elections & Ethics*, 104 F. Supp. 2d 18, 22 (D.D.C. 2000) (citing, *inter alia*, *Herbert v. Nat'l Acad. of Sci.*, 974 F.2d 192, 197 (D.C. Cir. 1992)).

## B.  Foreign Sovereign Immunities Act

The Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 *et seq.* ("FSIA") "entitles foreign states to immunity from the jurisdiction of courts in the United States, subject to certain

enumerated exceptions." *Saudi Arabia v. Nelson*, 507 U.S. 349, 351 (1993) (citations omitted). The FSIA provides the "sole basis for obtaining jurisdiction over a foreign state in the courts of this country." *Id.* at 355. Plaintiffs acknowledge that Ukraine is a foreign state, (2d Am. Compl. ¶ 25), and therefore Ukraine is "presumptively immune from the jurisdiction of United States courts" under the FSIA. *Nelson*, 507 U.S. at 355. "Courts may hear a case only if one of the [FSIA] exceptions applies because subject-matter jurisdiction in any such action depends on that application." *Republic of Austria v. Altmann*, 541 U.S. 677, 691 (2004) (quotation marks and citations omitted).

A plaintiff bears the "initial burden" of overcoming the FSIA's "'presumption of immunity' by making out a legally sufficient case that an exception does apply in the first place." *Helmerich & Payne Int'l Drilling Co. v. Bolivarian Republic of Venezuela*, 743 F. App'x 442, 449 (D.C. Cir. 2018) [hereinafter *Helmerich II*] (quoting *Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175, 1183 (D.C. Cir. 2013)). If a plaintiff meets that burden, then "the burden of persuasion rests with the foreign sovereign claiming immunity, which must establish the absence of the factual basis by a preponderance of the evidence." *Agudas Chasidei Chabad of U.S. v. Russian Federation*, 528 F.3d 934, 940 (D.C. Cir. 2008) (internal citations omitted). If a defendant challenges "only the legal sufficiency of the plaintiff's jurisdictional allegations," then the court must "take the plaintiff's factual allegations as true and determine whether they bring the case within any of the exceptions to immunity invoked by the plaintiff." *Phoenix Consulting Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000) (internal citations omitted). The court determines immunity on a claim-by-claim basis, and "[c]laims against foreign sovereigns that do not fall within the ambit of an FSIA exception are barred."

*Simon v. Republic of Hungary*, 812 F.3d 127, 141 (D.C. Cir. 2016) (quoting *Abelesz v. Magyar Nemzeti Bank*, 692 F.3d 661, 697 (7th Cir. 2012)).

### III. ANALYSIS

Plaintiffs assert this court has jurisdiction under three FSIA exceptions: expropriation, commercial activity, and waiver. (ECF No. 70 ("Pls. Br.") at 13, 23, 31.)

### A. Expropriation Exception

The FSIA's expropriation exception strips a foreign sovereign's immunity when a claim satisfies two elements: first, "'rights in property taken in violation of international law" must be at issue, and; second there must be "an adequate commercial nexus between the United States and the defendant[.]" *Philipp v. Federal Republic of Germany*, 894 F.3d 406, 410 (D.C. Cir. 2018) (quoting 28 U.S.C. § 1605(a)(3)). "A plaintiff must make more than a nonfrivolous showing that FSIA's expropriation exception applies." *Schubarth v. Federal Republic of Germany*, 891 F.3d 392, 399 (D.C. Cir. 2018) (citing *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1316 (2017) [hereinafter *Helmerich I*]).

#### 1. Takings in Violation of International Law

Plaintiffs contend that taking property without just compensation violates international law. (Pls. Br. at 13.)[2] Ukraine argues that the Ukrainian plaintiffs (the Ivanenkos and Luxexpress-II) did not suffer a taking in violation of international law under the "domestic takings rule." (ECF No. 63-1 ("Def. Br.") at 7.) As the D.C. Circuit has explained, while a

---

[2] Plaintiffs rely on a declaration from Yuriy Karmazin, a Ukrainian lawyer (ECF No. 69-4 ("Karmazin Decl.")). The Declaration includes Karmazin's opinion on whether the taking violated international law. (¶¶ 39–40.) The court excludes this portion of the Declaration because it is not expert testimony on Ukrainian law, his area of expertise, and instead impermissibly draws legal conclusions on the ultimate jurisdictional issue.

domestic taking may violate a state's domestic laws, such a taking is not "ordinarily a concern of international law." *Simon*, 812 F.3d at 144. This rule reflects the "broader reluctance of nations to involve themselves in the domestic politics of other sovereigns." *Id.* Therefore, "as a general matter, a plaintiff bringing an expropriation claim involving an intrastate taking cannot establish jurisdiction under the FSIA's expropriation exception because the taking does not violate international law." *Id.* at 144–45 (citing *Altmann*, 541 U.S. at 712 (Breyer, J., concurring)). Luxexpress-II is a Ukrainian company owned and operated by the Ivanenkos, who are both Ukrainian nationals. (2d Am. Compl. ¶¶ 20–22; Ivanenko Decl. ¶¶ 6–8.) Therefore, under the domestic takings rule, the alleged taking of their property did not violate international law, and the expropriation exception to immunity does not apply to their claims.

Plaintiffs' arguments to the contrary are unavailing. They contend that a domestic taking can violate international law when the taking is discriminatory or otherwise implicates fundamental rights. (Pls. Br. at 18–19.) Plaintiffs cite to the Supreme Court decision in *Helmerich I*, in which an American drilling company and its Venezuelan subsidiary sued Venezuela, alleging it had unlawfully expropriated oil rigs by nationalizing them. Plaintiffs contend that, under *Helmerich I*, "the 'general principle of immunity for these otherwise public actions should give way' where nationals' fundamental rights 'vis-à-vis their own governments' are violated." (Pls. Br. at 18 (citing *Helmerich I*, 137 S. Ct. at 1321).) But Plaintiffs overstate *Helmerich I*, which held only that a plaintiff must make more than a non-frivolous argument that jurisdiction exists, overturning the D.C. Circuit's more lenient standard. *Helmerich I*, 137 S. Ct. at 1321. The Court explained:

> A sovereign's taking or regulating of its own nationals' property within its own territory is often just the kind of foreign sovereign's public act (a "*jure imperii*") that the restrictive theory of sovereign immunity ordinarily leaves immune from suit . . . To be sure, there are fair arguments to be made that

> a sovereign's taking of its own nationals' property sometimes amounts to an expropriation that violates international law, and the expropriation exception provides that the general principle of immunity for these otherwise public acts should give way. But such arguments are about whether such an expropriation does violate international law.

*Id.* The Court did not, however, reference "fundamental rights" or further elucidate the types of cases in which a domestic taking can violate international law. *See id.* Moreover, on remand, the Circuit explained that while a discriminatory expropriation of foreign-owned assets may violate international law, a discriminatory expropriation of domestic-owned assets does not. *Helmerich II*, 743 Fed. App'x at 453. Therefore, the alleged discriminatory intent here does not transform a domestic taking into one of international concern.

The other D.C. Circuit cases Plaintiffs cite are inapposite. In *Simon v. Republic of Hungary*, 812 F.3d 127 (D.C. Cir. 2016), plaintiffs brought conversion and unjust enrichment claims against Hungary for wrongfully seizing Jewish citizens' assets during the Holocaust. *Id.* at 141–42. The Court explained that while a domestic taking typically does not violate international law, where the taking "amounted to the commission of genocide," it violated international law against genocide. *Id.* at 142–44. This is not the situation here; Plaintiffs point to no caselaw holding that the alleged abuse of process that lead to the expropriation violates customary international law.

Plaintiffs also seek support from *De Csepel v. Republic of Hungary,* which held that "garden-variety common-law causes of action" are actionable under the expropriation exception. *De Csepel v. Republic of Hungary*, 859 F.3d 1094, 1102 (D.C. Cir. 2017). As in *Simon*, the plaintiffs in *De Csepel* claimed Hungary seized Jewish assets during the Holocaust and brought conversion claims against the state. *Id.* The Court explained that common law claims of conversion and bailment meet the "rights in property" criterion and are therefore cognizable under the expropriation exception. *Id.* at 1103. Defendants have not argued otherwise, and this

court assumes for the sake of argument that Plaintiffs' claims are property-based and meet the "rights in property at issue" criterion. But a plaintiff's ability to bring a common law claim does not determine whether the domestic taking underlying the common law claim violated international law, and Plaintiffs have failed to show such a violation. Thus, the court finds that the Ukrainian plaintiffs have not shown that "rights in property were taken in violation of international law" and the FSIA's expropriation exception does not permit jurisdiction over their claims.[3]

The parties agree that because the alleged taking occurred in 2012, and the U.S.-based Luxexpress 2016 Corporation did not then exist, that company did not suffer a taking. (Def. Br. at 9; Pls. Br. at n.10.) Therefore, the expropriation exception does not apply to Luxexpress 2016's claim against Ukraine.

Finally, Plaintiffs allege that the U.S.-based Alamo Group suffered a taking of its no-cost sublease with Luxexpress-II for office space and of equipment and inventory as a result of the 2012 demolition. (2d Am. Compl. ¶¶ 15–18, 86.) Ukraine contends that Alamo Group had no property interests in Ukraine during the alleged taking. (Def. Br. at 9; Def. Reply at 9, n.9.) The court need not reach this issue because Alamo Group's claims do not establish a commercial-activity nexus with the United States.

---

[3] In addition to the D.C. Circuit cases discussed above, Plaintiffs cite numerous cases from other Circuits, many of which hold, as does the D.C. Circuit, that genocide cases may state a taking in violation of international law. Again, cases regarding genocidal domestic takings are not relevant here. The remainder of the cases upon which Plaintiffs rely do not address whether a domestic taking violates international law.

2.  Commercial-Activity Nexus

In a claim against a foreign state, a plaintiff must show a commercial-activity nexus, which establishes that the "property [at issue] or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state." *Simon*, 812 F.3d at 146.  The Second Amended Complaint does not allege that the expropriated property, or any property exchanged for it, is present in the United States, and therefore Plaintiffs cannot establish the first commercial-activity nexus.

For claims against agencies or instrumentalities, a plaintiff must first show that the "property [at issue] or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state."  28 U.S.C. § 1605(a)(3).  For immunity purposes, an "agency or instrumentality" is a state-owned commercial entity.  *See* 28 U.S.C. § 1603(b); *see also Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 234 (D.C. Cir. 2003) (explaining "if the core functions of the entity are governmental, it is considered the foreign state itself; if commercial, the entity is an agency or instrumentality of the foreign state").

Plaintiffs do not allege the property at issue is owned by an agency or instrumentality of Ukraine.  Plaintiffs claim the Kyiv City State Administration leased the land to Luxexpress-II and then expropriated it by terminating the lease and destroying the structures on the land.  (2d Am. Compl. ¶ 1, Exs. 10, 11.)  The Kyiv City State Administration is a political subdivision of Ukraine responsible for administering the city of Kyiv and is therefore not an agency or instrumentality of the state.  28 U.S.C. § 1603(a) ("A 'foreign state' . . . includes a political subdivision of a foreign state.").

To the extent Plaintiffs suggest that South-Western Railway is an "agency or instrumentality" of Ukraine and owns the property at issue, (2d Am. Compl. ¶¶ 25(h), 95–98),

Plaintiffs' threadbare pleadings on this issue do not allege the necessary factual predicates; they plead only that South-Western Railway is "a department, agency and instrumentality of Ukraine that shares responsibility for the running and operation of Ukraine, including its commercial activities." (2d Am. Compl. ¶ 25(h).) This conclusory allegation fails to establish that the Railway's core functions are commercial, that Ukraine is a majority owner of the Railway, or that the Railway owns the land at issue.

Plaintiffs appear to argue that because Ukraine conducts substantial business in the United States through its State Export-Import Bank, that may serve as the basis for the commercial-activity nexus in this suit. (Pls. Br. at 22.) But Plaintiffs plead no facts related to the Bank and have not established the Bank "owns or operates" the property at issue. *See* 28 U.S.C. § 1605(a)(3). Therefore, the Bank's activities have no bearing on whether Ukraine is immune from suit here.

Even were the court to find that Plaintiffs established the first criterion, they have not established the second—that the Railway or any other agency or instrumentality is engaged in a commercial activity in the United States. *See* 28 U.S.C. § 1605(a)(3).

Thus, the second commercial-activity nexus does not apply because Plaintiffs fail to allege sufficient facts to show that an agency or instrumentality of Ukraine owns or operates the property at issue and does not allege that such an agency or instrumentality is engaged in commercial activity in the United States.

Accordingly, the court finds that the FSIA's expropriation exception does not strip Ukraine of sovereign immunity.

**B. Commercial Activities Exception**

Plaintiffs also contend that Ukraine loses its sovereign immunity under the FSIA's commercial activity exception, under which a foreign sovereign loses immunity when the claim is based on "an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." 28 U.S.C. § 1605(a)(3).[4]

    1. Commercial or Sovereign Activity

"[C]ommercial activity" is "a regular course of commercial conduct or a particular commercial transaction or act." 28 U.S.C. § 1603(d). To determine an activity's "commercial character" the court examines "the nature of the course of conduct or particular transaction or act, rather than . . . its purpose. *Id.* "[W]hen a foreign government acts, not as regulator of a market, but in the manner of a private player within" that market, its acts are "commercial" under the FSIA. *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992). The court lacks jurisdiction over a foreign state "where a claim rests entirely upon activities sovereign in character, . . . regardless of any connection the sovereign acts may have with commercial activity." *Nelson*, 507 U.S. at n.4.

To determine the sovereign or commercial character of an activity, the court asks "not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives," but "whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party

---

[4] Because Plaintiffs do not claim Ukraine engaged in any conduct in the United States, the court will not address the other two bases for the commercial activity exception, which require conduct in the United States. *See* 28 U.S.C. § 1605(a).

engages in trade and traffic or commerce." *Weltover, Inc.*, 504 U.S. at 614 (citation and internal quotation marks omitted). Further, an "action is based upon the particular conduct that constitutes the gravamen of the suit." *OBB Personenverkehr AG v. Sachs*, 136 S. Ct. 390, 396 (2015) (internal quotation marks omitted).

The allegedly unlawful taking of property to build a bridge is the "gravamen" of Plaintiffs' suit, and normally, "a state's confiscation of property within its borders is not a 'commercial' act" under the FSIA. *Garb v. Republic of Poland*, 440 F.3d 579, 582 (2d Cir. 2006); *see also Rong v. Liaoning Province Gov't*, 452 F.3d 883, 890 (D.C. Cir. 2006). In *Rong*, plaintiffs sued a political subdivision of China, Liaoning Province, alleging it unlawfully took over a joint venture by declaring all equity interests to be state assets. *Id.* at 886. The D.C. Circuit found that despite some commercial activities related to the act (such as removing a director), "expropriation is a quintessential government act." *Id.* at 889. Similarly, while in this case the initial lease may be commercial activity, the later expropriation of the property is a quintessential government act. Moreover, the other allegations in the Second Amended Complaint do not describe commercial activity, but rather allege "abuses of official power for corrupt ends that could not be undertaken by private parties in a marketplace." *S.K. Innovation, Inc. v. Finpol*, 854 F. Supp. 2d 99, 111 (D.D.C. 2012).

2. Direct Effect

Even were the court to find the conduct at issue was commercial activity, Plaintiffs fail to show any "direct effect in the United States." 28 U.S.C. § 1605(a)(2). For an action in connection with a commercial activity to have a direct effect in the United States, the effect must "follow as an immediate consequence of the defendant's . . . activity." *Weltover*, 504 U.S. at 618. To be "direct" the effect "need not be 'substantial' or 'foreseeable' so long as it is more

than 'purely trivial.'" *Princz v. Federal Republic of Germany*, 26 F.3d 1166, 1172 (D.C. Cir. 1994) (quoting *Weltover*, 504 U.S. at 618).

Moreover, when the claims sound in tort, rather than contract, the court must focus on the "locus of the tort" to determine where the direct effect occurred.[5] *Bell Helicopter Textron, Inc.*, 734 F.3d at 1184 (quoting *Antares Aircraft, L.P. v. Federal Republic of Nigeria*, 999 F.2d 33, 34 (2d Cir. 1993)). The locus of the tort "is the place 'where the last event necessary to make an actor liable for an alleged tort takes place.'" *Nnaka v. Federal Republic of Nigeria*, 238 F. Supp. 3d 17, 29 (D.D.C. 2017), *aff'd*, 756 F. App'x 16 (D.C. Cir. 2019) (quoting *Atlantica Holdings v. Sovereign Wealth Fund Samruk–Kazyna JSC*, 813 F.3d 98, 109 (2d Cir. 2016)). In fact, "a determination that a tort's locus is the United States is, in effect, often a determination that the plaintiff has been injured in this country by the defendant's tortious actions—meaning that those actions caused a 'direct effect' (the plaintiff's injury) in this country." *Atlantica Holdings*, 813 F.3d at 109. Here, Plaintiffs' injuries stem from the loss of their leases and specific property, inventory and other equipment, all of which occurred in Kyiv. Therefore, the locus of the alleged torts is Ukraine.

Plaintiffs allege several effects in the United States: that Luxexpress-II failed to make timely loan repayments to Alamo Group (2d Am. Compl. ¶¶ 14, 17), that Alamo Group was forced to sell vehicles intended for Ukraine at a loss (*Id.* ¶ 16), that Alamo Group and Luxexpress-II abandoned plans to develop hotels with Marriot Corporation (*Id.* ¶ 18), and that, when Luxexpress-II lost its entire business, it lost shared offices and business in the U.S. (Pls.

---

[5] Although Plaintiffs allege that Defendants terminated their leases, Plaintiffs did not bring claims for breach of contract.

Br. at 28).[6]  None of these allegations, however, show that the locus of the tort was in the U.S., and moreover, these effects were not the "immediate consequence" of the taking, but rather the downstream consequences of Luxexpress-II losing its business and failing to fulfill its other contracts.  Further, "the fact that an American individual or firm suffers some financial loss from a foreign tort cannot, standing alone, suffice" to show a "direct effect" in the United States.  *Bell Helicopter Textron, Inc.*, 734 F.3d at 1184 (quoting *Antares Aircraft, L.P.*, 999 F.2d at 34); *see also Soudavar v. Islamic Republic of Iran*, 67 F. App'x 618, 619 (D.C. Cir. 2003) ("[A] mere financial loss by a resident of the United States does not constitute a 'direct effect' in the United states" for the purposes of the commercial activity exception.).

Plaintiffs look to a Second Circuit case, *Texas Trading & Milling Corp. v. Fed. Republic of Nigeria*, 647 F.2d 300 (2d Cir. 1981), as support for the proposition that a U.S. corporation's financial loss can be a direct effect in the U.S.  (Pls. Br. at 25.)  In *Texas Trading*, Nigeria breached cement contracts with three U.S. companies; under the terms of the contracts, the companies were supposed to collect money and present documents in the U.S.  647 F.2d at 312.  The Court found that the companies suffered financial loss in the U.S. because the breach prevented them from performing elements in the U.S., and therefore the breach had a direct effect in the U.S.  *Id.*  Here, unlike *Texas Trading*, Plaintiffs have not sued for breach of contract, in which the place of performance determines the location of the direct effect.  *See Odhiambo v. Republic of Kenya*, 764 F.3d 31, 38 (D.C. Cir. 2014).  Further, the contracts that required payment in American currency in the U.S. were between two of the Plaintiffs, Luxexpress-II and

_____

[6] Plaintiffs again rely on the Karmazin Declaration, which opines on whether the taking had a direct effect in the United States.  (¶¶ 35–38.)  The court excludes this portion of the Declaration because it is not expert testimony on Ukrainian law, it is outside Karmazin's area of expertise, and it impermissibly draws legal conclusions on the ultimate jurisdictional issue.

Alamo Group, and did not include Ukraine. Thus, Plaintiffs fail to show the taking had a direct effect in the U.S.[7]

Accordingly, the court finds that Plaintiffs have not met their burden to show sufficient facts that the FSIA's commercial activity exception strips Ukraine of its sovereign immunity in this suit.

## C. Waiver Exception

Plaintiffs' final basis for asserting jurisdiction is under the FSIA's waiver exception. A foreign state can waive its sovereign immunity "either explicitly or by implication," 28 U.S.C. § 1605(a)(1), but a court will not find a foreign sovereign waived its immunity unless it "has clearly and unambiguously done so." *World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1162 (D.C. Cir. 2002). "[E]xplicit waivers of sovereign immunity are narrowly construed in favor of the sovereign and are not enlarged beyond what the language requires." *Id.* An implied waiver "depends upon the foreign government's having at some point indicated its amenability to suit." *Princz*, 26 F.3d at 1174. While the FSIA does not define "implied waiver," courts construe the provision narrowly, finding an implied waiver only where a foreign state has: 1) filed a responsive pleading without raising sovereign immunity, 2) agreed to arbitrate in the United States, and 3) agreed to a particular choice of law. *World Wide Minerals, Ltd*, 296 F.3d 1154, at n.11. "[C]ourts have been reluctant to stray beyond these examples when considering

---

[7] The other cases Plaintiffs cite are also inapposite. *Martin v. Republic of South Africa*, 836 F. 2d 91 (2d Cir. 1987) found that a U.S. citizen's car accident in South Africa did not have a direct effect in the U.S. *Gibbons v. Uddaras Na Gaeltachta*, 549 F. Supp. 1094, 1112–1114 (S.D.N.Y. 1982), and *Gemini Shipping Inc. v. Foreign Trade Organization for Chemicals and Foodstuffs*, 647 F.2d 317, 319 (2d Cir. 1981) both addressed whether a defendant had sufficient contacts with the U.S. to meet the standard for commercial activity "carried on in the United States" under 28 U.S.C. § 1603(e). Here, neither party contends that Ukraine's alleged commercial activity was "carried on in the United States."

claims that a nation has implicitly waived its defense of sovereign immunity." *Princz*, 26 F.3d at 1174 (internal quotation and quotation marks omitted).

1. Presidential Decree

Plaintiffs assert that Ukraine waived sovereign immunity under the Presidential Decree of February 22, 2016, "On Amending the Procedure of Protection of Rights and Interests of Ukraine during Settlement Disputes" (the "Decree"). (2d Am. Compl. ¶ 69.) When Plaintiffs filed this suit, the Ukrainian Ministry of Justice did not have authority to represent Ukraine in suits brought in foreign courts by Ukrainians. (ECF No. 63-4 ("Yanchuk Decl.") ¶ 6–7.) The President of Ukraine then amended Ukraine's "Procedure on Foreign and International Representation" by adopting the Decree. (ECF No. 63-5 ("Starosvit Decl.") ¶ 16.) The parties have provided two different translations of the Decree. (ECF No. 63-5 ("Starosvit Decl.") ¶ 18; ECF No. 69-4 ("Karmazin Decl.") ¶ 31.)[8] Both translations agree that the Decree expands the definition of "foreign subjects" to include "citizens of Ukraine, legal entities of Ukraine," and "stateless persons" when those people bring suits that could result in liability "against Ukraine" "in a foreign jurisdiction." (*See* Starosvit Decl. ¶ 18; Karmazin Decl. ¶ 31.) Plaintiffs also argue that the Decree means the Ministry of Justice can "take measures necessary to reach agreements with a foreign entity . . . of dispute settlement on mutually beneficial and mutually acceptable

---

[8] Under Federal Rule of Civil Procedure 44.1, a court interpreting a foreign country's law "may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." Fed. R. Civ. P. 44.1. Foreign law is regularly established by "expert testimony accompanied by extracts from foreign legal material." *Ganem v. Heckler*, 746 F.2d 844, 854 (D.C. Cir. 1984). "Such expert testimony is intended to aid the court in determining the content of the law, not in applying that law to the facts of the case." *Estate of Botvin ex rel. Ellis v. Islamic Republic of Iran*, 772 F.Supp.2d 218, 227–28 (D.D.C. 2011). Therefore, the court relies on the parties' declarations for their assessment of the content of the law, not for any of their legal conclusions.

terms[.]" (Karmazin Decl. ¶ 32.) Neither side's translation of the Decree references sovereign immunity.

The Decree neither explicitly nor impliedly waives Ukraine's sovereign immunity. Neither translation suggests that the Decree references a waiver of sovereign immunity, and the court, as it must, narrowly construes the Decree as permitting only Ukraine to defend itself in a suit in U.S. court brought by a Ukrainian national. Therefore, the Decree does not "clearly and unambiguously" waive Ukraine's sovereign immunity. *See World Wide Minerals, Ltd.*, 296 F.3d at 1162. Nor does it waive sovereign immunity by implication, because it is not an agreement to arbitrate in the United States and has no choice-of-law provision selecting U.S. law. *See Princz*, 26 F.3d at 1174. Because those are the only methods by which a court may find waiver, *see id.*, the court finds that the Decree does not waive Ukraine's sovereign immunity.

2. Bi-Lateral Investment Treaty

Plaintiffs further contend that Ukraine waived immunity through a bi-lateral investment treaty with the United States because the parties acknowledged in that treaty that an aggrieved party could sue either in the U.S. or Ukraine without invoking immunity. (Pls. Br. at 31 (citing Treaty Concerning the Encouragement and Reciprocal Protection of Investment, U.S.-Ukraine, March 4, 1994 ("Treaty").) Assuming the Treaty even applies to Plaintiffs' investments, it does not purport to waive either nation's sovereign immunity under the facts alleged here. The Treaty discusses resolving unlawful expropriation claims in Article III, providing: "A national or company of either Party that asserts that all or part of its investment has been expropriated shall have a right to prompt review by the appropriate judicial or administrative authorities of the other Party . . ." Treaty, art. III, ¶ 2. Under this article, the aggrieved party, Plaintiffs, have the right to seek review "by the appropriate judicial or administrative authorities of the other

Party"—that is, Ukraine. This provision does not, however, permit review in U.S. courts, nor does it purport to waive Ukraine's sovereign immunity. *See S.K. Innovation, Inc.*, 854 F. Supp. 2d at 115 (holding a similar provision in the bilateral investment treaty between Kazakhstan and the United States did not waive Kazakhstan's sovereign immunity).

Moreover, Article VI provides that if a dispute cannot be settled, the parties can submit the dispute to "the courts or administrative tribunals of the Party that is a party to the dispute," to an arbitral tribunal, or in accordance with any other previously agreed upon dispute-settlement procedures. Treaty, art. IV, ¶¶ 2, 3. Again, Ukraine did not purport to waive sovereign immunity by providing for dispute resolution in its own courts or administrative bodies when it is the party involved. *See S.K. Innovation, Inc.*, 854 F. Supp. 2d at 115 (holding a similar provision in the bilateral investment treaty between Kazakhstan and the United States did not waive Kazakhstan's sovereign immunity).

Plaintiffs point to *Eckert International Incorporated v. Government of Sovereign Democratic Republic of Fiji*, 32 F.3d 77 (4th Cir. 1994), for the proposition that states can waive immunity by signing agreements. In that case, Fiji signed an agreement that included a choice-of-law provision providing that the agreement be construed according to Virginia law. *Id.* at 79. The Fourth Circuit held that Fiji had implicitly waived its sovereign immunity through the choice-of-law provision, which indicated that Virginia was the forum of choice. *Id.* at 80. Plaintiffs here point to no similar choice-of-law provision in the Treaty showing that Ukraine intended to have disputes governed by U.S. law. To the contrary, the Treaty has specific provisions that the party to the suit shall provide the forum for review, whether judicial or administrative. Treaty, art. III, IV. So, while Plaintiffs are correct that foreign states can waive

immunity by signing certain agreements, *World Wide Minerals, Ltd.*, 296 F.3d 1154, at n.11, here, Ukraine did not waive its sovereign immunity by signing the Treaty.

### D. **Other Alleged Jurisdictional Bases**

Plaintiffs also assert jurisdiction under other varied treaties and customary international law.  (2d Am. Compl. ¶ 63 (referencing United Nations Convention on Jurisdictional Immunities of States), ¶ 68 (referencing Agreement on Trade Relations Between Ukraine and the United States).)  But Plaintiffs did not respond to Ukraine's arguments that neither the U.N. Convention nor the trade agreement confer jurisdiction, and therefore Ukraine's arguments will be treated as conceded.  (*See* Def. Br. at 17–18.)

### E. **Jurisdictional Discovery**

Finally, Plaintiffs are not entitled to jurisdictional discovery.  While the Federal Rules of Civil Procedure "generally provide for liberal discovery to establish jurisdictional facts," *Goodman Holdings v. Rafidain Bank*, 26 F.3d 1143, 1147 (D.C. Cir. 1994), jurisdictional discovery is "intended to supplement, not substitute for, initial jurisdictional allegations."  *Doe I v. State of Israel*, 400 F. Supp. 2d 86, 121–22 (D.D.C. 2005) (citing *GTE New Media Servs., Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1351 (D.C. Cir. 2000); *Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1089 (D.C. Cir. 1998)).  In addition, "to avoid burdening a sovereign that proves to be immune from suit, . . . jurisdictional discovery should be carefully controlled and limited."  *Phoenix Consulting Inc.*, 216 F.3d at 40 (citing *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 449 (D.C. Cir. 1990)).

Plaintiffs' initial jurisdictional allegations were inadequate to establish jurisdiction, and they articulate no basis for discovery.  They broadly seek discovery to "develop facts necessary to support FSIA jurisdiction," (Pls. Br. at 29–30), but the only specific request is for discovery to

determine "the full extent to which Ukrainian state-owned businesses and banks conduct business" in the United States, (*Id.* at 22). Plaintiffs do not, however, claim that any businesses or banks, such as Ukraine's State Export-Import Bank, have any connection to the alleged taking that is the subject of this suit. Because discovery would not "produce facts that would affect [the] jurisdictional analysis," the court finds discovery is unwarranted in this case. *Goodman Holdings*, 26 F.3d at 1147.

## IV.    CONCLUSION

Because no FSIA exception strips Ukraine of its sovereign immunity, this court lacks subject-matter jurisdiction. Accordingly, the court need not address Ukraine's other arguments for dismissal to resolve the pending motion.

For the stated reasons, the court will GRANT Defendant Ukraine's motion to dismiss. A corresponding Order will issue separately.

Date:  March 19, 2020

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge